UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

In re:

RENAISSANT LAFAYETTE LLC,

Debtor.

Chapter 11

Case No. 09-38166-PP

## ORDER (A) APPROVING SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS PURSUANT TO 11 U.S.C. §§105(A) AND 363 TO AMALGAMATED BANK, AS TRUSTEE OF LONGVIEW ULTRA CONSTRUCTION LOAN INVESTMENT FUND, F/K/A LONGVIEW ULTRA 1 CONSTRUCTION LOAN INVESTMENT FUND AND (B) AUTHORIZING DEBTOR TO ASSUME AND ASSIGN EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO AMALGAMATED BANK, AS TRUSTEE OF LONGVIEW ULTRA CONSTRUCTION LOAN INVESTMENT FUND, F/K/A LONGVIEW ULTRA 1 CONSTRUCTION LOAN INVESTMENT FUND, AND FIXING CURE AMOUNTS PURSUANT TO 11 U.S.C. §365

This matter having come before the Court on the Debtor's Amended Motion for Entry of

(A) An Order (I) Approving the Sale of Substantially All of Debtor's Assets Free and Clear of

Drafted by:
Peter C. Blain, Esq.
Bret M. Harper, Esq.
Reinhart Boerner Van Deuren s.c.
1000 North Water Street, Suite 1700
Milwaukee, WI 53202
pblain@reinhartlaw.com
bharper@reinhartlaw.com

Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. §§ 105 and 363 and (II)

Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired

Leases Pursuant to 11 U.S.C. § 365 and (III) Granting Related Relief [Docket No. 163] (the

"Sale Motion"),[1] which seeks entry of, *inter alia*, this order (the "Order") authorizing the sale

(the "Sale") of substantially all of Debtor's assets (the "Assets") free and clear of liens, claims,

encumbrances, and interests pursuant to sections 105 and 363 of title 11 of the United States

Code (the "Bankruptcy Code") and Rules 2002, 6004, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") to Amalgamated Bank, as Trustee of Longview

Ultra Construction Loan Investment Fund f/k/a Longview Ultra 1 Construction Loan Investment

Fund (together with any assignee of its rights under the APA, collectively the "Bank"), pursuant

to that certain Asset Purchase Agreement (the "APA") by and between Debtor and Bank dated as

of October 1, 2010, and attached hereto as Exhibit A; the Court having entered on November 24,

2010, its Notice and Order (I) Establishing Sale Procedures; (II) Approving Form of Asset

Purchase Agreement; (III) Scheduling a Sale Hearing in Connection with the Sale of the Debtor's

Assets Pursuant to 11 U.S.C. §§ 105(a), 363 and 365 and (IV) Setting Certain Dates and

Deadlines [Docket No. 224] (the "Sale Procedures Order"); the Court finding, as more fully set

forth below, that (i) proper notice of (A) the deadlines and methods for asserting objections to

the Sale Motion and the entry of this Order and (B) the December 23, 2010 hearing on the Sale

Motion (the "Sale Hearing"), and the entry of this Order have been provided to all parties

entitled thereto as required by applicable law and by the Sale Procedures Order, and no other or

further notice of any such matters is required and (ii) the appearances of all interested parties and

all responses and objections, if any, to the Sale Motion and the entry of this Order have been

---

[1] All capitalized terms used but not defined in this Order shall have the meanings ascribed to them in the Sale Motion.

duly noted in the record of the Sale Hearing and such objections or responses have been withdrawn, otherwise resolved, or overruled; the Court having considered (I) the Sale Motion and the legal and factual bases set forth in support of the Sale Motion; (II) the form of this Order submitted to the Court; (III) objections or other responses made to the Sale Motion and the entry of this Order, and (IV) the entire record of the Sale Hearing, including any evidence submitted at or prior to the Sale Hearing; the Court finding that the relief sought by the Sale Motion and contained in this Order is in the best interest of Debtor, its estate, and its creditors; the Court being otherwise fully advised in the premises, and after due deliberation and sufficient cause appearing therefor,

The Court hereby <strong>FINDS, DETERMINES AND CONCLUDES THAT:</strong>[2]

A.      This Court has jurisdiction to approve the Sale pursuant to 28 U.S.C. §§ 157 and 1334. Venue of these cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      Approval of the Sale is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (N), and (O). The statutory predicates for the relief granted herein are Bankruptcy Code §§ 105, 363, and 365 and Bankruptcy Rules 2002 (including, without limitation, Bankruptcy Rule 2002(i)), 6004, and 6006.

C.      As evidenced by certificates filed with the Court and representations of counsel at the Sale Hearing and the hearing related to the Sale Procedures Order, proper, timely, adequate, and sufficient notice of, and a reasonable opportunity to object or otherwise to be heard regarding, (i) the entry of the Sale Procedures Order and the dates and deadlines set forth therein,

---

[2] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. Pursuant to Bankruptcy Rule 7052, to the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. Statements made by the Court from the bench during the Sale Hearing shall constitute additional conclusions of law and findings of fact, as appropriate.

including the procedures required for the submission of Qualified Bids for the Assets and for participation by interested bidders at an auction of those Assets (the "Auction"); (ii) the Sale Motion; (iii) the entry of this Order; and (iv) the transactions contemplated under the APA, including the Sale and the assumption and assignment of executory contracts identified in the APA ("Assigned Contracts") and the establishment of Cure Amounts proposed in connection therewith, has been provided to (a) the Office of the United States Trustee, (b) the Bank, Debtor's prepetition senior secured lender; (c) the Official Committee of Unsecured Creditors ("Committee"); (d) all parties known to Debtor who assert a security interest in or lien on the Assets, or assert a claim against or interest in the Assets; (e) all non-Debtor parties to the Assigned Contracts; (f) the Internal Revenue Service of the United States Department of the Treasury; and (g) entities, or their counsel, not described above, who have filed a notice of appearance through the Court's CM/ECF System.

D. The foregoing notice constitutes good and sufficient notice of, and a reasonable opportunity to object or be heard regarding, the Sale Motion, the Sale Hearing, and the entry of this Order, under Bankruptcy Code §§ 102(1), 363, and 365 and Bankruptcy Rules 2002 (including, without limitation, 2002(i)), 6004, and 6006 and the Sale Procedures Order. No other or further notice of, opportunity to object to, or other opportunity to be heard regarding, the Sale Motion, the Sale Hearing, or the entry of this Order need be given to any entity.

E. The Sale Procedures Order vested Houlihan with the obligation (after consultation with Debtor, the Committee and the Bank (each such party, in that consultative capacity, a "Consulting Party" and, collectively, the "Consulting Parties")) to designate Qualified Bids.

F.     As demonstrated by (i) the testimony and other evidence admitted, proffered, or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the hearing:

(a)     Debtor has, with the assistance of Houlihan and in all respects, adequately and appropriately marketed the Assets being sold to the Bank.

(b)     The Consulting Parties and their respective professionals have complied in all respects and in good faith with the Sale Procedures Order, including (I) by affording entities that wished to submit a Qualified Bid a full, fair, and reasonable opportunity to obtain necessary due diligence information and to submit the materials required under the Sale Procedures Order by the Qualified Bid Deadline and (II) by consulting regarding all bids received by the Qualified Bid Deadline.

(c)     The Bank and its respective professionals have complied in all respects and in good faith with the Sale Procedures Order.

(d)     No Qualified Bids, other than the Stalking Horse Bid, were submitted in accordance with the Sale Procedures Order before the Qualified Bid Deadline.

G.     The offer to purchase the Assets made by the Bank, under the terms and conditions set forth in the APA: (i) represents the highest or otherwise best offer obtained for the Assets; (ii) is for fair, adequate, and sufficient consideration that constitutes reasonably equivalent value for the Assets being conveyed to the Bank, (iii) would not have been made by the Bank absent the protections afforded to the Bank by the Bankruptcy Code and this Order, (iv) will provide a better recovery for the Debtor's creditors than would be provided by any other practical available alternative, and (v) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state,

territory, possession or the District of Columbia. A sale of the Assets other than one free and clear of all prepetition and postpetition liens (including, without limitation, any "lien" as defined in Bankruptcy Code § 101(37)), claims (including, without limitation, any "claim" as defined in Bankruptcy Code § 101(5)), encumbrances, defenses (including, without limitation, rights of setoff and recoupment) and interests (collectively, "Interests") would impact materially and adversely on Debtor's bankruptcy estate, would yield substantially less value for Debtor's estate, and would provide less certainty than the available alternatives. The Bank would not agree to purchase the Assets if the Assets could not be transferred to the Bank free and clear of all Interests.

H. Entry into the APA and consummation of the transactions contemplated thereby as required by the terms set forth in the Sale Procedures Order constitute the exercise of sound business judgment and such acts are in the best interests of Debtor, its estate, and all parties in interest. The Court finds that Debtor has articulated good and sufficient business reasons justifying the Sale. Such business reasons include, but are not limited to, the following: (i) the APA constitutes the highest or otherwise best offer for the Assets; (ii) the APA and the closing thereon will present the best opportunity to realize the value of the Assets on a going concern basis and avoid decline and devaluation of the Assets; and (iii) any alternative would not have likely yielded as favorable an economic result.

I. Each entity with an Interest in any of the Assets to be transferred on the Closing Date has (i) consented to, or is deemed to have consented to, the Sale free and clear of such Interests, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Interest, or (iii) holds an interest that is a lien that is worth less than the amount of the purchase price to be paid by the Bank under the APA, and therefore, in each case, one or more of

the standards set forth in Bankruptcy Code § 363(f) has been satisfied as to all such Interests. Those holders of Interests who did not object, or who withdrew their objections, to the Sale Motion are deemed to have consented to entry of this Order pursuant to Bankruptcy Code § 363(f)(2). Therefore, approval of the APA and consummation of the Sale at this time free and clear of Interests is appropriate pursuant to Bankruptcy Code § 363(f).

       J.     The Bank is not holding itself out to the public as a continuation of Debtor, and no common identity of incorporators, directors, stockholders, members, or other equity holders exists between the Bank and Debtor. The transactions contemplated by the APA do not amount to a consolidation, merger, or de facto merger of the Bank and Debtor and/or Debtor's estate, there is not substantial continuity between the Bank and Debtor, there is no continuity of enterprise between Debtor and the Bank, the Bank is not a mere continuation of Debtor or its estate, and the Bank does not constitute a successor to Debtor or its estate.

       K.     Upon the Closing, the Bank shall be deemed to have assumed only the Assumed Liabilities. Except with respect to the Assumed Liabilities, the Closing and the consummation of the transactions contemplated by the APA shall not, by reason of such Closing and transactions, subject the Bank to any liability whatsoever for claims with respect to the operation of the business of Debtor before the Closing Date. Except for the Assumed Liabilities, the Bank's acquisition of the Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing.

       L.     The Bank and the Debtor negotiated the APA and the transactions contemplated by the APA from arm's length bargaining positions, without collusion, and in good faith within the meaning of Bankruptcy Code § 363(m) and (n). As a result of the foregoing, Debtor and the

Bank are entitled to the protections of Bankruptcy Code § 363(m) with respect to those transactions.

M.     The Bank is not an "insider" of Debtor, as that term is defined in Bankruptcy Code § 101(31). Neither the Bank, Debtor, nor any other Consulting Party has engaged in any conduct that would cause or permit the APA to be avoided under Bankruptcy Code § 363(n).

N.     The Bank will be acting in good faith pursuant to Bankruptcy Code § 363(m) in closing the transactions contemplated by the APA at any time on or after the entry of this Order.

O.     The (i) transfer of the Assets to the Bank and (ii) assignment to the Bank of the Assigned Contracts, will not subject the Bank to any liability whatsoever prior to the Closing Date (defined below) or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust, successor or transferee liability. The Debtor has demonstrated that it is an exercise of its sound business judgment to assume and assign the Assigned Contracts to the Bank in connection with the consummation of the Sale, and the assumption and assignment of the Assigned Contracts is in the best interests of the Debtor, its estate, and its creditors. The Assigned Contracts being assigned to the Bank are an integral part of the Assets being purchased by the Bank and, accordingly, such assumption and assignment of Assigned Contracts is reasonable, enhances the value of the Debtor's estates, and does not constitute unfair discrimination. Each and every provision of the Assigned Contracts or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning, assignment of any of the Assigned Contracts has been satisfied or is unenforceable under Bankruptcy Code § 365.

P. At the Closing under the APA, or as soon as practicable thereafter, the Debtor shall (i) cure, or have provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Assigned Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(A), and (ii) provide compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assigned Contracts within the meaning of 11 U.S.C. § 365(b)(1)(B). Other than the payment of the Cure Amounts, the Debtor shall have no further obligations to non-Debtor parties to the Assigned Contracts. The Bank has provided adequate assurance of future performance of and under the Assigned Contracts within the meaning of 11 U.S.C. § 365(b)(1)(C). Upon assignment and sale to the Bank, the Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order.

Q. The Sale of the Assets must be approved and consummated promptly to preserve the value of the Assets. Therefore, time is of the essence in consummating the Sale, and Debtor and the Bank intend to close the Sale as soon as possible.

R. The APA was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

S. The transfer of the Assets to the Bank will be a legal, valid, and effective transfer of the Assets, and will vest the Bank with all right, title, and interest of Debtor to the Assets free and clear of all Interests as set forth in the APA.

T. The terms of the APA are fair and reasonable in all respects and the terms of the Order shall not modify the terms of the APA.

U.     The Sale does not constitute a *sub rosa* Chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.  The Sale neither impermissibly restructures the rights of the Debtor's creditors, nor impermissibly dictates a liquidating plan of reorganization for the Debtor.

V.     The Cure Amounts listed on Exhibit B hereto are the full and complete Cure Amounts due for existing defaults under the Assigned Contracts.[3]

W.     The Court incorporates by reference as if fully set forth herein any findings of fact and conclusions of law set forth on the record of the Sale Hearing.

**For all of the foregoing reasons and after due deliberation, the Court ORDERS, ADJUDGES AND DECREES THAT:**

1.     The Sale Motion is GRANTED, and the Sale of the Assets, the APA, the assignment of the Assigned Contracts to the Bank, and the transactions contemplated in the APA are hereby approved and authorized in all respects in accordance with, and under Bankruptcy Code §§ 363(b), 363(f), 363(m) and 365(a).

2.     Objections, if any, to the Sale Motion or to the relief granted herein that have not been withdrawn, waived, settled, or otherwise resolved and all reservations of rights included in such objections, are overruled on the merits.

3.     Pursuant to 11 U.S.C. § 363(b), the Court approves in all respects the Sale of the Assets to the Bank free and clear of all Interests (except those specifically permitted by the APA), and the transactions contemplated thereby are approved in all respects.  The Debtor is authorized and directed to sell the Assets to the Bank upon the terms and subject to the

---

[3] Pursuant to the APA, the Bank has reserved the right to designate additional executory contracts for assumption and assignment, subject to Court approval.

conditions set forth in the APA, with, subject to the terms of this Order, such modifications as may be agreed to by the Bank and the Debtor.

4. The APA, including any amendments, supplements and modifications thereto, and all of the terms and conditions therein, is hereby approved. Debtor and the Bank are both hereby authorized and directed to take all actions and execute all documents and instruments that Debtor or the Bank reasonably deem necessary or appropriate to implement and effectuate the transactions contemplated by the APA, including, without limitation, to execute all documents and further agreements necessary or appropriate to implement and effectuate the APA.

5. Pursuant to Bankruptcy Code § 363(b) and (f), upon the Closing under the APA, the transfer of the Assets to the Bank will be legal, valid and effective transfers and shall vest the Bank with all right, title and interest of Debtor in and to the Assets, free and clear of all Interests, including, without limitation, security interests of whatever kind or nature, mortgages, pledges, deeds of trust, hypothecations, assignments, preferences, debts, charges, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state and local taxes), licenses, covenants, indentures, instruments, leases, options, contracts, agreements, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, tax, labor, ERISA, CERCLA, alter-ego and other liabilities, causes of action known or unknown, free and clear of all contract rights and claims, in each case to the fullest extent of the law, of any kind or nature, whether prepetition or postpetition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material,

known or unknown, statutory or non-statutory, matured or unmatured, legal or equitable, with all such Interests in and upon the Assets to be unconditionally released, discharged and terminated.

6. Pursuant to 11 U.S.C. § 363 (b) and 363(f), the Assets shall be transferred to the Bank upon consummation of the APA (the "Closing Date") free and clear of all Interests of any kind or nature whatsoever.

8. On the Closing Date, this Order will be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Assets or a bill of sale transferring good and marketable title in such Assets to the Bank. On the Closing Date, and subject to Section 365 of the Bankruptcy Code, this Order also shall be construed and shall constitute for any and all purposes a complete and general assignment of all right, title and interest of the Debtor to the Bank in the Assigned Contracts.

9. All entities who are presently, or on the Closing Date may be, in possession of some or all of the Assets are hereby directed to surrender possession of the Assets to the Bank on the Closing Date.

10. Except as expressly permitted by the APA or this Order all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade and other creditors, holding Interests of any kind or nature whatsoever against or in Debtor or the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, Debtor, the Assets, or the transfer of the Assets to the Bank, hereby are forever barred, estopped, and permanently enjoined from asserting against the Bank, its successors and/or assigns, its property, or the Assets, such persons' or entities' Interest.

11.     On the Closing Date of the Sale, each of the Debtor and its creditors, vendors and executory contracts counterparties (other than counterparties whose executory contracts are being assumed hereunder) is authorized and directed to execute such documents and take all other actions as may be necessary to release its Interests in the Assets, if any, as such Interests may have been recorded or otherwise exist.

12.     The Sale of the Assets to the Bank under the APA constitutes a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of all applicable jurisdictions, including, but not limited to, the laws of the State of Wisconsin. The transfer of the Assets by Debtor to the Bank is a legal, valid and effective transfer of the Assets notwithstanding any requirement for approval or consent of any entity. All entities presently or on the Closing Date that may be in possession of some or all of the Assets are directed to surrender possession of the Assets to the Bank on or before the Closing Date.

13.     The Bank is a good faith purchaser for value and, as such, is entitled to all of the protections afforded under 11 U.S.C. § 363(m) and any other applicable bankruptcy and no bankruptcy law. The Bank acted in good faith at the Auction and Sale Hearing and will be acting in good faith within the meaning of 11 U.S.C. § 363(m) in closing the transactions contemplated by the APA.

14.     The consideration provided by the Bank for the Assets under the APA is fair and reasonable. As a good faith purchaser of the Assets, the Bank has not entered into an agreement with any other potential bidders at the Sale, and has not colluded with any of the other bidders, potential bidders or any other parties interested in the Assets, and therefore neither the Debtor nor any successor in interest to the Debtor's estate shall be entitled to bring an action against the Bank, and the Sale may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

15.    Debtor is authorized and directed to assign and transfer to the Bank all of Debtor's rights, title and interest (including common law rights) to all of Debtor's intangible property to be assigned and transferred to the Bank under the APA.

16.    After the closing of the Sale, the Bank is authorized and directed to pay as follows (provided, however, that the Bank is not obligated to pay under this paragraph any amounts greater than $600,000):

(a)    Up to $250,000 to the counsel for the Debtor to pay allowed administrative expenses;

(b)    Up to $50,000 to counsel for the Committee to pay allowed administrative expenses;

(c)    $20,000 to the Debtor's management;

(d)    The full amount of allowed priority claims (if any); and

(e)    10% of the total amount of each allowed unsecured claim, including, without limitation, any construction lien claims.

17.    Nothing contained in any plan of reorganization or plan of liquidation confirmed in Debtor's Chapter 11 case, in any order confirming such a plan, or in any other order of the Court shall conflict with or deviate from the provisions of the APA or the terms of this Order, and to the extent such provisions do conflict then the terms of the APA control over such conflicting orders or plan. To the extent the Order conflicts with the APA, the APA controls.

18.    Neither the Bank's purchase of the Assets nor the Bank's subsequent operation of the business previously operated by Debtor shall cause the Bank to be, or to be deemed to be: (a) a successor-in-interest in any respect to Debtor or Debtor's businesses under applicable law; or (b) a joint employer, co-employer or successor employer with Debtor. The Bank shall have no obligation to pay wages, severance pay, vacation pay, WARN Act claims, benefits or any other payments to employees of Debtor.

19.    The Bank shall have no liability or responsibility for any liability or other obligation of Debtor arising under or related to the Assets other than for the Assumed Liabilities. Without limiting the generality of the foregoing, and except as otherwise specifically provided in the APA, the Bank shall not be liable for any claims against Debtor or any of its predecessors or affiliates, and the Bank shall have no successor liabilities of any kind or character whether known or unknown as of the Closing Date, now existing or hereinafter arising, whether fixed or contingent, with respect to Debtor, the Assets or any obligations of the Debtor arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, or in connection with, or in any way relating to the operation of the business prior to the Closing Date.

20.    By entering into the APA, the Bank has not purchased any of the Excluded Assets and has not assumed or otherwise become obligated for any of Debtor's liabilities other than the Assumed Liabilities as set forth in the APA. The Bank shall not have successor or transferee liability or otherwise be liable in any way to any third party for any Excluded Asset or any liabilities of Debtor except the Assumed Liabilities (whether by contract, state law or otherwise). All Persons, as defined in Bankruptcy Code § 101(41), holding unassumed liabilities against Debtor are hereby enjoined, pursuant to Bankruptcy Code § 105 and 363, from asserting or prosecuting any claim or cause of action against the Bank or the Assets to recover on account of any liabilities other than Assumed Liabilities under the APA. Notwithstanding any language herein, nothing in this Order shall enjoin or preclude the assertion or prosecution of any claims by Debtor or its successors or assigns arising under the APA.

21.    This Court shall retain exclusive jurisdiction to interpret and enforce the provisions of the APA, the Sale Procedures Order, and this Order, including all amendments to

the APA and each of these orders and any waivers and consents thereunder, and further to hear and determine each of the agreements executed in connection therewith, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Assets to the Bank free and clear of Interests, or compel the performance of other obligations owed by the Debtor, (b) resolve any disputes arising under or related to the APA, except as otherwise provided therein, (c) interpret, implement, and enforce the provisions of this Order, and (d) protect the Bank against (i) claims made related to any of the Excluded Assets (as defined in the APA), (ii) any claims of successor liability related to the Assets or Assigned Contracts, or (iii) any claims of Interests asserted in the Debtor or the Assets, of any kind or nature whatsoever; *provided however*, that, in the event the Court abstains from exercising or declines to exercise such jurisdiction or is without jurisdiction with respect to the APA, the Sale Procedures Order, or this Order, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

22.     The provisions of this Order are nonseverable and mutually dependent. The failure to include specifically any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA and all of its provisions, payments, and transactions be authorized and approved in their entirety.

23.     On the Closing Date, this Order shall be construed as, and shall constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of the Assets or a bill of sale transferring good and marketable title in the Assets to the Bank. Each and every federal, state and local governmental agency, department or entity is hereby directed to accept

the filing of any and all documents and instruments necessary and appropriate to implement, effectuate or consummate the transactions contemplated by the APA and this Order.

24.     Debtor and each other person having duties or responsibilities under the APA, any agreements related thereto, or this Order, and their respective members, directors, officers, agents, representatives and attorneys, are hereby authorized and directed to execute and deliver any and all instruments, including all such other actions, filings or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units, as may be required to effectuate the APA and this Order.  For the avoidance of doubt, all persons and entities (i) holding liens or encumbrances, (ii) that have filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing claims, or (iii) otherwise asserting claims against the Assets shall, and hereby are directed to, execute and deliver to Debtor or its designated representative(s) any and all documents necessary (or requested by Debtor or the Bank) to effectuate the transfer of the Assets to the Bank free and clear of any and all liens and encumbrances.

25.     The requirements of Bankruptcy Code §§ 365(b)(1) and 365(f)(2) are hereby deemed satisfied with respect to the Assigned Contracts.  Debtor is hereby authorized and directed, in accordance with Bankruptcy Code §§ 105(a), 363, and 365, to (i) assume and assign and transfer to the Bank the Assigned Contracts free and clear of all Interests, and (ii) execute and deliver to the Bank such assignment documents as may be necessary to confirm such assignment and transfer.  Payment, or the provision of adequate assurance for prompt payment, of the Cure Amounts set forth in Exhibit B at the Closing or as soon as practicable thereafter shall be made, in compliance with Bankruptcy Code §§ 365(b)(1)(A) and (B).  The Bank has

provided adequate assurance of its future performance of and under the Assigned Contracts within the meaning of Bankruptcy Code § 365(b)(1)(C).

26.     The Assigned Contracts shall be transferred and assigned to the Bank, and, following the Closing, shall remain valid and binding and in full force and effect for the benefit of, the Bank in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract (including those of the type described in Bankruptcy Code §§ 365(b)(2), (e)(1) and (f)(1)) that prohibits, restricts, or conditions such assignment or transfer. Pursuant to Bankruptcy Code § 365(k), Debtor shall be relieved from any further liability with respect to any breach of an Assigned Contract after assignment of such Assigned Contract to the Bank. Any provisions in any Assigned Contract that prohibit or condition the assignment of such Assigned Contract or allow the party to such Assigned Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract constitute unenforceable anti-assignment provisions which are void and of no force or effect. All other requirements and conditions under Bankruptcy Code §§ 363 and 365 for the assumption by Debtor and assignment to the Bank of each Assigned Contract have been satisfied and, upon Closing, the Bank shall be fully and irrevocably vested in all right, title and interest of each Assigned Contract.

27.     Upon assignment of the Assigned Contracts to the Bank and payment of the Cure Amounts, no non-Debtor party to any Assigned Contract shall be permitted to declare a default by the Bank under such Assigned Contract or otherwise take action against the Bank on account of Debtor's financial condition, bankruptcy, or Debtor's failure to perform any of its obligations under such Assigned Contract, including any failure to pay any amounts to cure defaults thereunder in excess of those Cure Amounts set forth in Exhibit B hereto. The Court hereby

determines that the Cure Amounts established pursuant to the Sale Procedures Order, or as otherwise agreed by the non-Debtor parties to the Assigned Contracts, constitute all of the cure amounts that are required to be paid under Bankruptcy Code § 365(b)(1) in connection with the assumption and assignment of the Assigned Contracts. The Bank shall have no liability or obligation to cure Assumed Contract defaults accruing after the Petition Date but before the Closing Date. Notwithstanding any language in this paragraph to the contrary, Debtor and the Bank shall be responsible for all taxes and tax payments as provided in the APA.

28. Each non-Debtor party to an Assigned Contract hereby is forever barred, estopped, and permanently enjoined from asserting against the Debtor or the Bank, or the property of either of them, any default existing as of the date of the Sale Hearing.

29. Upon the assignment of the Assigned Contracts to the Bank at the Closing, the Bank shall be deemed, as of the Closing, to be in compliance with all terms and provisions of the Assigned Contracts. Except for the right to payment of the Cure Amounts, pursuant to Bankruptcy Code §§ 105(a), 363 and 365, all parties to the Assigned Contracts are forever barred and enjoined from raising or asserting against Debtor and the Bank any assignment fee, default, breach or claim for pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts existing as of the Closing or arising by reason of the Closing. Any party that may have had the right to consent to an assignment, for purpose of Bankruptcy Code § 365(e)(2)(A)(ii) or otherwise, is deemed to grant such consent if it failed to object to the assumption and assignment.

30. Pursuant to the APA, the rights of the Bank may be assigned, and any such assignee shall have the benefit of, and shall be entitled to enforce all provisions of this Order as if it were the Bank.

31.     The APA and any related agreements may be modified, amended, or supplemented by agreement of Debtor, Bankers, and the Bank without further action of the Court; provided that any such modification, amendment, or supplement is not material and substantially conforms to and effectuates the APA.

32.     This Order (a) shall be effective as a determination that, on the Closing Date, all Interests of any kind or nature whatsoever existing as to the Assets prior to the Closing Date have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Assets. Each and every federal, state and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA. The Bank and the Debtor shall take such further steps and execute such further documents, assignments, instruments and papers as shall be reasonably requested by the other to implement and effectuate the transactions contemplated in this paragraph. All interests of record as of the date of this Order shall be forthwith removed and stricken as against the Assets. All entities described in this paragraph are authorized and specifically directed to strike all such recorded Interests against the Assets from their records, official and otherwise.

33.     If any person or entity that has filed statements or other documents or agreements evidencing Interests in any of the Assets does not deliver to the Debtor or the Bank prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all interests and other interests that the person or entity has or may assert with respect to any of the Assets, the Debtor and/or the Bank are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such persons or entity with respect to any of the Assets.

34.     The Debtor will cooperate with the Bank and the Bank will cooperate with the Debtor, in each case to ensure that the transaction contemplated in the APA is consummated, and the Debtor will make such modifications or supplements to any bill of sale or other document executed in connection with the Closing to facilitate such consummation as contemplated by the APA (including, without limitation, adding such specific assets, to such documents, as may be reasonably requested by the Bank pursuant to the terms of the APA.

35.     The terms and provisions of the APA and this Order shall be binding in all respects upon, and shall inure to the benefit of the Debtor, its successors and assigns, its estate, and its creditors, the Bank, and its respective affiliates, successors and assigns, and any affected parties including, but not limited to, all persons asserting Interests in the Assets to be sold to the Bank pursuant to the APA, notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

36.     The failure specifically to include any particular provisions of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

37.     To the extent applicable, the automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to Debtor to the extent necessary, without further order of the Court (a) to allow the Bank to give Debtor any notice provided for in the APA, and (b) to allow the Bank to take any and all actions permitted by the APA.

38.     To the extent a counterparty to an Assigned Contract failed to timely object to a Cure Amounts (as defined in the Sale Procedures Order), such Cure Amounts shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to or denying the validity and finality of the Cure Amounts at any time, and such Cure Amounts, when paid, shall completely revive any Assigned Contract to which it relates.

39.     The Sale shall not be subject to any bulk sales laws.

40.     The Debtor and each other person having duties or responsibilities under the APA or this Order, and their respective agents, representatives, and attorneys, are authorized and directed to carry out all of the provisions of the APA, to issue, execute, deliver, file and record, as appropriate, the APA, and any related agreements, and to take any action contemplated by the APA or this Order, and to issue, execute, deliver, file and record, as appropriate, such other contracts, instruments, releases, deeds, bills of sale, assignments, or other agreements, and to perform such other acts as are consistent with, and necessary or appropriate to, implement, effectuate and consummate the APA and this Order and the transactions contemplated thereby and hereby, all without further application to, or order of, the Court. Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required

by applicable business corporation, trust and other laws of applicable governmental units with respect to the implementation and consummation of the APA and this Order and the transactions contemplated thereby and hereby.

###

**Exhibit A**

**APA**

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") dated October 1, 2010 (the "Execution Date"), is made by and between RENAISSANT LAFAYETTE LLC, a Wisconsin limited liability company, as debtor and debtor-in-possession (the "Seller," or the "Debtor") and AMALGAMATED BANK, a bank organized under the laws of the State of New York, as Trustee of Longview Ultra Construction Loan Investment Fund f/k/a Longview Ultra I Construction Loan Investment Fund, a collective trust fund organized under the laws of the State of New York (the "Buyer," or the "Bank").

## RECITALS

WHEREAS, the Seller is a debtor and debtor-in-possession in a case (a "Bankruptcy Case") in the United States Bankruptcy Court for the Eastern District of Wisconsin (the "Bankruptcy Court") pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code");

WHEREAS, the Seller desires to sell the Purchased Assets, and the Buyer desires to buy the Purchased Assets, either directly, or through a designee or assignee;

WHEREAS, the parties hereto have agreed that subject to the terms and conditions of this Agreement, the Seller shall sell and the Buyer shall acquire the Purchased Assets free and clear of all Liens, Claims, and Indebtedness other than the Assumed Liabilities, under Section 363(f) of the Bankruptcy Code; and

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by all parties, the parties have agreed as follows:

## ARTICLE I.
## DEFINITIONS

1.1    Certain Definitions

For purposes of this Agreement, the following terms shall have the respective meanings set forth below:

"*Accounts Receivable*" means all obligations to pay money, whether documents in the form of trade notes, or otherwise, or accounts receivable arising out of goods provided or services performed in connection with the operation of, or relating to, the Business.

"*Affiliate*" or "*Affiliates*" shall mean with respect to a specified Person, another Person that, either directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the Person specified.

"*Agreement*" has the meaning set forth in the opening paragraph of this Agreement.

REINHART\4075545_14RWH:BMH 10/18/10

"*Ancillary Documents*" has the meaning set forth in Section 2.4(b)(x).

"*Applicable Laws*" shall mean any statute, law, rule, regulation, code or ordinance or any Order of any Governmental Authority to which a specified Person or property is subject.

"*Asset Allocation*" has the meaning set forth in Section 2.2.

"*Assignment Agreement for Postpetition Real Property Leases*" shall mean an instrument substantially in the form attached hereto as Exhibit B, assigning Postpetition Real Property Leases and any related security deposits to the Buyer.

"*Assignment and Assumption Agreement for Assumed Contracts*" shall mean an instrument substantially in the form attached hereto as Exhibit A, assigning the Assumed Contracts to the Buyer.

"*Assignment for Intellectual Property*" shall mean an instrument substantially in the form attached hereto as Exhibit C, assigning the Intellectual Property to the Buyer.

"*Assignment of Declarant Rights*" shall mean an instrument substantially in the form attached hereto as Exhibit G, assigning to Buyer all of Seller's rights as declarant or developer under the Declaration.

"*Assumed Contracts*" shall mean all Contracts listed on Exhibit D attached hereto.

"*Assumed Liabilities*" shall mean those obligations specified in Section 2.6.

"*Auction*" has the meaning set forth in Section 2.9(a).

"*Avoidance Actions*" means any and all actions which a trustee, debtor in possession or other appropriate party in interest may assert on behalf of the Estate under Chapter 5 of the Bankruptcy Code, including actions under one or more provisions of sections 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, and 553.

"*Bank*" has the meaning set forth in the Recitals to this Agreement.

"*Bankruptcy Case*" has the meaning set forth in the recitals of this Agreement.

"*Bankruptcy Code*" has the meaning set forth in the recitals of this Agreement.

"*Bankruptcy Court*" has the meaning set forth in the recitals of this Agreement.

"*Bankruptcy Rules*" shall mean the Federal Rules of Bankruptcy Procedure.

"*Bid Materials*" has the meaning set forth in Section 5.7(a).

"*Bill of Sale for Purchased Assets*" shall mean an instrument substantially in the form attached hereto as Exhibit F, assigning, conveying and transferring the Purchased Assets (other than the Assumed Contracts and the Real Property) to the Buyer.

"*Books and Records*" shall mean all business records, books, files, ledgers, documents and correspondence owned and controlled by the Seller, confidential and otherwise, in whatever form, wherever located, which relate to the Seller, the Business, or the Purchased Assets including market information, sales aids, customer and supplier lists, files, records and data; capital expenditure plans and studies; emergency studies; maintenance and repair reports; accounting, real property, environmental, tax, health, safety records; plans and designs for capital and cost reduction projects, but excluding the Excluded Books and Records.

"*Business*" shall mean all business now or heretofore conducted by the Seller, including, without limitation all business relating to the development, rental, construction, sale or resale of the Real Property.

"*Business Day*" shall mean any date, other than a Saturday, Sunday or any other day on which national banks are required or authorized by law to close in New York, New York.

"*Buyer*" has the meaning set forth in the introductory paragraph to this Agreement and shall include a nominee of the Bank.

"*Capital Stock*" means, with respect to: (a) any corporation, any share, or any depositary receipt or other certificate representing any share, of an equity ownership interest in the corporation; and (b) any other Entity, any share, membership or other percentage interest, unit of participation or other equivalent (however designated) of an equity interest in the Entity.

"*Charter Documents*" means, with respect to any Entity at any time, in each case as amended, modified and supplemented at that time, (a) the articles or certificate of formation, incorporation or organization (or the equivalent organizational documents) of the Entity, (b) the bylaws or limited liability company agreement or regulations (or the equivalent governing documents) of the Entity, and (c) each document setting forth the designation, amount and relative rights, limitations and preferences of any class or series of the Entity's Capital Stock or of any rights in respect of the Entity's Capital Stock.

"*Claim*" means a claim against the Seller or its property, as such term is defined in section 101(5) of the Bankruptcy Code.

"*Closing*" shall mean the consummation of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities, in each case in accordance with the terms and provisions of this Agreement.

"*Closing Date*" has the meaning set forth in Section 2.3.

"*Closing Payment*" has the meaning set forth in Section 2.1(c).

"*Code*" shall mean the Internal Revenue Code of 1986, as amended (or the applicable provisions of any succeeding statute).

"*Committee*" means the Official Committee of Unsecured Creditors appointed in the Bankruptcy Case pursuant to Section 1102 of the Bankruptcy Code.

"*Condominium Association*" shall mean the Park Lafayette Condominium Association, Inc., a Wisconsin corporation.

"*Confidential Information*" has the meaning set forth in Section 5.7(a).

"*Contract*" shall mean any agreement, arrangement, contract, lease, purchase order, sale order or commitment or other binding arrangement or understanding, whether written or oral as to which the Seller is a party.

"*Cure Amount*" has the meaning set forth in Section 2.5(b).

"*Debtor*" has the meaning set forth in the introductory paragraph to this Agreement.

"*Declaration*" shall mean that certain Declaration of Condominium Ownership for the Park Lafayette Condominium dated May 4, 2009, and recorded with the Milwaukee County Register of Deeds on June 5, 2009, as Document Number 09748305.

"*Deeds*" shall have the meaning set forth in Section 2.4(b)(i).

"*DIP Financing*" shall mean any and all amounts loaned by the Bank to the Debtor pursuant to the Bankruptcy Court's (i) Interim Order (A) Authorizing Debtor to Obtain Postpetition Secured Financing and (B) Granting Other Relief, entered on January 25, 2010; (ii) Second Interim Order (A) Authorizing Debtor to Obtain Postpetition Secured Financing and (B) Granting Other Relief entered on March 1, 2010; (iii) Third Interim Order (A) Authorizing Debtor to Obtain Postpetition Secured Financing and (B) Granting Other Relief entered on March 16, 2010; (iv) Fourth Interim Order (A) Authorizing the Debtor to Obtain Postpetition Secured Financing and (B) Granting Other Relief entered on April 14, 2010; (v) Fifth Interim Order (A) Authorizing the Debtor to Obtain Postpetition Secured Financing and (B) Granting Other Relief entered on April 26, 2010; (vi) Sixth Interim Order (A) Authorizing the Debtor to Obtain Postpetition Secured Financing and (B) Granting Other Relief entered on June 3, 2010; (vii) Seventh Interim Order (A) Authorizing the Debtor to Obtain Postpetition Secured Financing and (B) Granting Other Relief entered on June 17, 2010; (viii) Eighth Interim Order (A) Authorizing the Debtor to Obtain Postpetition Secured Financing and (B) Granting Other Relief entered on July 20, 2010; or any subsequent order the Bankruptcy Court may enter in the future authorizing the Bank to lend, and the Debtor to incur, additional postpetition secured financing.

"*Employee*" shall mean an employee of the Seller.

"*Employee Benefit Plan(s)*" shall mean any employee benefit plan (as defined in Section 3(3) of ERISA or material fringe benefit plan maintained or contributed to or required to be contributed to by the Seller.

"*Entity*" means any sole proprietorship, corporation, partnership of any kind having a separate legal status, limited liability company, business trust, unincorporated organization or association, mutual company; joint stock company or joint venture.

"*Equipment*" means to the extent owned by the Seller, all machinery and equipment, spare parts, furniture, office equipment, computer equipment and hardware, fittings, tools,

apparatus, signage, maintenance equipment, sales and marketing materials, vehicles and other personal property of any kind or type that is used or held for use in connection with Business, a general inventory of which is attached hereto as Schedule 1.1.

"*ERISA*" shall mean the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations thereunder.

"*Estate*" means the estate created pursuant to Section 541 of the Bankruptcy Code with respect to the Seller.

"*Evaluation Materials*" has the meaning set forth in Section 5.7(a).

"*Excluded Assets*" shall mean (i) any Avoidance Actions, (ii) the right to the Purchase Price and other rights granted to the Seller under this Agreement, (iii) the Excluded Books and Records, (iv) all claims arising prior to the Closing Date under any directors and officers liability insurance policies owned by the Seller, (v) professional retainers paid by the Seller, (vi) any intercompany receivable or other amount owed to the Seller by any Affiliate of the Seller.

"*Excluded Books and Records*" shall mean (i) any Tax Returns, and (ii) any books and records of whatever type relating to the Seller as an Entity, including stock records and minute books.

"*Execution Date*" has the meaning set forth in the opening paragraph of this Agreement.

"*Final Order*" shall mean (i) an order of the Bankruptcy Court as to which the time to file an appeal, a petition for certiorari or a motion for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings or motion for reargument or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, motion for reargument or rehearing thereof has been filed or sought, such order of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied or motion for reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to file any further appeal, a petition for certiorari or motion for reargument or rehearing shall have expired.

"*Governmental Approvals*" shall mean those approvals, authorizations, confirmations, consents, exemptions and orders from Governmental Authorities and the making of all necessary registrations and filings (including filings with Governmental Authorities) and the taking of all reasonable steps as may be necessary to obtain an approval or waiver from, or to avoid an action or proceeding to prevent the Closing by, any Governmental Authority, which are required to be obtained or taken to consummate the transactions contemplated herein under applicable Law.

"*Governmental Authority*" shall mean any national, federal, state, provincial, municipal, local or foreign government, or any subdivision, agency, instrumentality, authority, department, commission, board or bureau thereof, or any federal, state, provincial, municipal, local or foreign court, tribunal, or arbitrator, including the Bankruptcy Court.

"*Indebtedness*" with respect to any Person shall mean any obligation of such Person for borrowed money, but in any event shall include: (i) any obligation or liabilities incurred for all

or any part of the purchase price of property or other assets or for the cost of property or other assets constructed or of improvements thereto, other than accounts payable included in current liabilities and incurred in respect of property purchased in the ordinary course of business (whether such Person has assumed or become liable for the payment of such obligation) (whether accrued, absolute, contingent, unliquidated or otherwise, known or unknown, whether due or to become due); (ii) the face amount of all letters of credit issued for the account of such Person and all unpaid drafts drawn thereunder; (iii) obligations incurred for all or any part of the purchase price of property or other assets or for the cost of property or other assets constructed or of improvements thereto, other than accounts payable included in current liabilities and incurred in respect of property purchased in the ordinary course of business (whether or not such Person has assumed or become liable for the payment of such obligation) secured by Liens; (iv) capitalized lease obligations; and (v) all guarantees of such Person of obligations of other Persons of the type referred to in clauses (i) through (iv) above.

"*Intellectual Property*" shall mean the Intellectual Property Rights owned or used by the Seller that are used in, or held for use in, the Business.

"*Intellectual Property Rights*" means all intellectual property rights, including both statutory and common law rights, throughout the world, as applicable, in or to any (a) patents, patent applications and invention disclosure, (b) copyrights, registrations, renewals and applications for registrations thereof, (c) trade secrets, know-how and confidential information, or (d) trademarks, trade names, service marks, trade dress, product configurations, slogans, logos and any applications and registrations therefor.

"*Interests*" shall mean all rights of any kind whatsoever in the Purchased Assets, as that term is used in Section 363(f) of the Bankruptcy Code

"*Law*" or "*Laws*" shall mean all federal, state, provincial, territorial, municipal, local or foreign laws, including common law, orders, writs, injunctions, decrees, codes, guidelines, policies, ordinances, awards, stipulations, judgments, directions, requirements, statutes, judicial or administrative doctrines, rules or regulations enacted, promulgated, issued or entered by a Governmental Authority, including the Bankruptcy Code and the Code.

"*Lien*" shall mean any (i) security interest, lien, mortgage, pledge, hypothecation, encumbrance, Claim, easement, charge, restriction on transfer or otherwise, or Interest of any kind or nature, including any conditional sale or other title retention Contract or lease in the nature thereof; (ii) any filing or agreement to file a financing statement as debtor under the applicable Uniform Commercial Code or any similar statute; and (iii) any subordination arrangement in favor of another Person.

"*Loss Repair Amount*" means the amount of money necessary to replace the Purchased Assets or to repair or restore them to their condition as of the date of this Agreement in excess of insurance proceeds payable to Seller or Seller's lenders. The parties shall attempt to agree upon the Loss Repair Amount. If within 20 days after a determination by Seller's insurers of amounts to be paid, if any, under the Seller's policies of insurance, the parties are unable to agree, then each shall select a Recognized General Contractor, and two selected shall select a third Recognized General Contractor who shall determine the Loss Repair Amount.

"*Material Adverse Effect*" shall mean any event, change, condition, or matter that individually or in the aggregate results in or could reasonably be expected to result in a material adverse effect or change in the result of operations, properties, assets or condition (financial or otherwise) of the Purchased Assets and the Business in the aggregate or the Purchased Assets taken as a whole, excluding any event, change, condition, or matter (i) resulting from the filing of the Bankruptcy Case or (ii) that affects generally the business in which the Seller is engaged and does not disproportionately affect the Seller.

"*Notice*" has the meaning set forth in Section 8.2.

"*Order*" shall mean any writ, judgment, decree, injunction or similar order, writ, ruling directive or other requirement of any Governmental Authority (in each such case whether preliminary or final).

"*Permits*" shall mean all permits, licenses, confirmations, franchises, notices certificates, and authorizations or similar documents issued by any Governmental Authority that relate to or otherwise are used or are necessary in connection with the Seller's operation of the Business.

"*Person*" or "*Persons*" shall mean any individual, company, corporation, association, partnership, limited liability company, firm, joint venture, trust or Governmental Authority.

"*Prepetition Real Property Lease*" shall mean any lease or sublease of the Real Property entered into prior to the Petition Date, a list of which is attached hereto as Schedule 1.5, complete as of the date indicated in Schedule 1.5, which shall be within one (1) business day of Seller's execution of this Agreement.

"*Postpetition Real Property Lease*" shall mean any lease or sublease of the Real Property entered into after the Petition Date, a list of which is attached hereto as Schedule 1.6, complete as of the date indicated in Schedule 1.6, which shall be within one (1) business day of Seller's execution of this Agreement.

"*Protected Materials*" has the meaning set forth in Section 5.7(a).

"*Petition Date*" shall mean December 23, 2009.

"*Purchase Price*" has the meaning set forth in Section 2.1(b).

"*Purchase Contracts*" shall mean any and all contracts entered into by or on behalf of Seller for the sale of any portion of the Real Property on or before the Closing Date, a list of which is attached hereto as Schedule 1.3, complete as of the date indicated in Schedule 1.3, which shall be within one (1) business day of Seller's execution of this Agreement.

"*Purchased Assets*" shall mean any and all assets and rights of the Seller which are used in or held for use in the Business, other than the Excluded Assets, including the following:

(a)     Cash and cash equivalents (other than cash and cash equivalents which constitute the Purchase Price or any other amounts payable by the Buyer hereunder, or amounts that have been placed into escrow accounts for the benefit of professionals);

(b)     Real Property;

(c)     All of Seller's right, title and interest in and to any Prepetition Real Property Leases assumed by Seller, and assigned to the Buyer;

(d)     All of Seller's right, title and interest in and to any Postpetition Real Property Leases, which shall be assigned to the Buyer by the Seller;

(e)     Accounts Receivable;

(f)     Equipment;

(g)     all rights under Assumed Contracts;

(h)     all Intellectual Property Rights owned or used by the Seller;

(i)     all goodwill relating to the Business;

(j)     to the extent permitted by law, all Permits;

(k)     all refunds, deposits, prepayments and prepaid expenses relating to any Assumed Contracts;

(l)     all security deposits held pursuant to any Prepetition Real Property Leases assumed by Seller and assigned to Buyer;

(m)     all security deposits held pursuant to any Postpetition Real Property Leases assigned to Buyer;

(n)     all earnest money deposits held pursuant to any Purchase Contracts assumed by Seller and assigned to Buyer;

(o)     all funds held by, or on behalf of, the Condominium Association;

(p)     all books, records and accounts of the Condominium Association;

(q)     all claims, causes of action, rights of recovery or setoff of any kind against any Person who holds an Assumed Liability; and

(r)     all Books and Records.

"*Real Property*" shall mean all of the real estate, fixtures and improvements, including all rights, privileges and easements appurtenant thereto and owned by the Seller relating to the Business as legally described on <u>Schedule 1.4</u>, including without limitation, all of Seller's right, title and interest in and to units in the "Park Lafayette Condominium", a condominium established by the Declaration, together with all appurtenant rights, title and interests, for such units including (without limitation):

REINHART\075545_14RWH:BMH 10/18/108

(a) the undivided percentage interest in all common elements as specified for such units in the aforementioned Declaration;

(b) the right to use of the areas and/or facilities, if any, specified in the aforementioned Declaration, as limited common elements for such units; and

(c) membership in the Condominium Association, as provided for in the aforementioned Declaration and in any articles of incorporation and/or bylaws for the Condominium Association, provided that the legal description set forth in Schedule 1.4 may be amended as of the Closing Date as necessary to reflect any sales of condominium units that have been completed prior to the Closing Date in accordance with the terms thereof.

*"Recognized General Contractor"* means a general contractor experienced in constructing the types of assets which have been damaged, lost or destroyed.

*"Representatives"* shall mean, with respect to any Person, the officers, directors, employees, attorneys, investment bankers, accountants and other agents and representatives of such Person.

*"Retained Liabilities"* has the meaning set forth in Section 2.7.

*"Sale Hearing"* has the meaning set forth in Section 2.9(a).

*"Sale Order"* has the meaning set forth in Section 6.1(b).

*"Sale Procedures Motion"* shall mean a motion, satisfactory to Buyer, to be filed by the Seller with the Bankruptcy Court seeking, among other things, entry of the Sale Order and the Sale Procedures Order.

*"Sale Procedures Order"* means an order of the Bankruptcy Court, satisfactory to Buyer, that approves, *inter alia*, sale procedures to be followed by the Seller and all potential bidders for the Purchased Assets.

*"Seller"* has the meaning set forth in the Recitals to this Agreement.

*"Tax"* or *"Taxes"* shall mean all federal, state, local, foreign or provincial taxes, charges, fees, duties, levies or other assessments, including income, gross receipts, Capital Stock, net proceeds, ad valorem, turnover, real, personal and other property (tangible and intangible), sales, use, franchise, excise, value added, stamp, leasing, lease, user, transfer, fuel, excess profits, occupational, interest equalization, windfall profits, unitary, severance and employees' income withholding, unemployment and Social Security taxes, duties, assessments and charges (including the recapture of any tax items such as investment tax credits), which are imposed by the United States, or any Governmental Authority, including any interest, penalties or additions to tax related thereto imposed by any Governmental Authority (including any interest or penalties with respect to such Taxes).

*"Tax Return"* shall mean all reports, estimates, declarations of estimated tax, information statements and returns relating to, or required to be filed in connection with, any Taxes,

Case 09-38166-pp    Doc 163-1    Filed 10/22/10    Page 10 of 26

Case 09-38166-pp    Doc 283-1    Filed 12/23/10    Page 10 of 73

Case 09-38166-pp    Doc 285-1    Filed 12/27/10    Page 33 of 96

including information returns or reports with respect to backup withholding and other payments to third parties.

"*Title Company*" shall mean Chicago Title Insurance Company.

"*Transaction Taxes*" has the meaning set forth in Section 5.8.

"*UST*" has the meaning set forth in Section 5.2.

1.2    Other Terms

Other terms may be defined elsewhere in this Agreement and, unless otherwise indicated, shall be used as so defined throughout this Agreement.

1.3    Interpretation

Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation". The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.

## ARTICLE II.
## PURCHASE OF ASSETS

2.1    Purchase.

(a)    *Purchase.* Subject to the satisfaction of the conditions contained in this Agreement, on the Closing Date, the Seller shall sell, transfer, assign, convey, and deliver to the Buyer, free and clear of all Liens, Claims, Interests and Indebtedness, except Assumed Liabilities, all as contemplated by Section 363 of the Bankruptcy Code, and the Buyer shall purchase and accept all right, title and interest of the Seller in and to the Purchased Assets.

(b)    *Purchase Price.* The purchase price for the Purchased Assets (the "Purchase Price") shall be Fifty Five Million Dollars ($55,000,000.00).

(c)    *Payment of Purchase Price.* At Closing, the Buyer shall pay to the Seller's estate the Purchase Price in the following form (the "Closing Payment"):

(i)    Credit, through cancellation of the Debtor's DIP Financing obligations to Buyer, in the amount of the DIP Financing loaned by the Bank and still outstanding as of the Closing; and

(ii)    Credit, through cancellation of the Debtor's prepetition Indebtedness to the Seller, in an amount equal to the Purchase Price less the amounts described in the preceding subsection.

(d)  *Assumption of Liabilities.*  At Closing, as additional consideration to the Seller for the sale of the Purchased Assets, the Buyer shall assume, and agree to pay, perform, fulfill and discharge, the Assumed Liabilities.

(e)  *Estate Carve-out and Mechanic's Lien Escrow.*  At Closing, the Bank shall pay to the Debtor in cash the amounts specified in paragraph 18 of the Sale Procedures Motion to the extent liquidated and allowed on the Closing Date, and the Debtor and the Bank shall establish a mechanism for the Bank to fund any future cash payments that may be needed under paragraph 18.

2.2    Allocation of Purchase Price.

The Buyer and the Seller agree to allocate the Purchase Price (together with any Assumed Liabilities) for the Purchased Assets as set forth on Schedule 2.2 (the "Asset Allocation").  The Asset Allocation shall be completed in the manner required by Section 1060 of the Code and the applicable Treasury Regulations promulgated thereunder.  The Buyer and the Seller further agree to comply with all filing, notice and reporting requirements described in Section 1060 of the Code and the applicable Treasury Regulations promulgated thereunder, including the timely preparation and filing of Form 8594 based on the Asset Allocation.  The Buyer and the Seller hereby agree that they will report the federal, state, foreign and other Tax consequences of the transactions contemplated by this Agreement in a manner consistent with the Asset Allocation.

2.3    Closing.

The Closing shall occur within three Business Days following the satisfaction or waiver of the conditions to Closing set forth in Article VI (or on such other date or at such other time and place as the parties shall agree in writing); provided, however, that the Closing shall occur no later than December 31, 2010 (the "Closing Date").  The Closing shall take place at the offices of Reinhart Boerner Van Deuren s.c. in Milwaukee, Wisconsin or at such other location as agreed to by the parties.

2.4    Closing Deliveries.

(a)    At the Closing, unless waived by the Seller, the Buyer shall deliver or cause to be delivered, or execute and deliver, as applicable, to the Seller:

(i)    the Assignment and Assumption Agreement for Assumed Contracts;

(ii)    the Assignment Agreement for Postpetition Real Property Leases;

(iii)    the Assignment for Intellectual Property;

(iv)    the Closing Payment;

(v)    a certificate, dated as of the Closing Date, executed on behalf of the Buyer, certifying that the conditions to Buyer's obligations to consummate this transaction have been satisfied or waived; and

(vi)     any other documents, certificates, instruments or writings reasonably requested by the Seller to reflect the assumption by Buyer of the Assumed Liabilities or other obligations expressly contemplated herein.

(b)     At the Closing, unless waived by the Buyer, the Seller shall deliver or cause to be delivered, or execute and deliver, as applicable, to the Buyer:

(i)     real estate related closing documents including [a] special limited warranty deed(s) for the Real Property (the "Deeds"), duly executed by Seller; [b] those certain affidavits required by the Title Company to issue the Title Policy as are appropriate under the circumstances; [c] any applicable State and local transfer tax statements duly sworn by Seller, if required; [d] Entity Non-foreign Affidavit properly completed and duly sworn by Seller and [e] Form 1099 properly completed and duly sworn by Seller;

(ii)     the Bill of Sale for Purchased Assets;

(iii)     the Assignment and Assumption Agreement for Assumed Contracts;

(iv)     the Assignment Agreement for Postpetition Real Property Leases;

(v)     the Assignment for Intellectual Property;

(vi)     the Assignment of Declarant Rights;

(vii)     Resignations from any Affiliate or representative of Seller serving as an officer or director of the Condominium Association, effective as of the Closing Date;

(viii)     a certificate, dated as of the Closing Date, executed on behalf of the Seller, certifying that the conditions to Seller's obligations to consummate this transaction have been satisfied or waived;

(ix)     a certified copy of the Sale Order, which order has not been reversed or modified on appeal or, if any such appeal is pending, such order shall not have been stayed;

(x)     a certified copy of the record of appropriate action taken by the Seller authorizing [a] the sale of the Purchased Assets to Buyer in accordance with the terms of this Agreement, [b] the execution and delivery of this Agreement by the Seller, and [c] the execution and delivery by the Seller of all other Closing Documents which are to be executed and delivered by the Seller; and

(xi)     any other documents, certificates, instruments or writings reasonably requested by Buyer necessary to transfer all Purchased Assets to the

Buyer (all the documents referred to in Sections 2.4(a) and 2.4(b) being referred to as the "Ancillary Documents").

2.5     Assignment and Assumption of Contracts.

(a)     The Seller shall assign to Buyer all Postpetition Real Property Leases.

(b)     Subject to approval of the Bankruptcy Court, the Buyer designates as Assumed Contracts certain executory contracts and unexpired leases listed on Exhibit D, attached hereto, to be assumed by the Debtor, and assigned to the Buyer.

(c)     Exhibit E attached hereto lists cure amounts (each, a "Cure Amount") for each Assumed Contract which, in the Debtor's good faith estimation, represents an appropriate amount to be paid in order to assume such Assumed Contracts under Section 365 of the Bankruptcy Code.  Such Cure Amounts are subject to final determination by the Bankruptcy Court.

(d)     The Debtor shall serve on each non-Debtor party to an Assumed Contract notice of assumption and assignment, including the estimated Cure Amount.

(e)     Each non-Debtor party to an Assumed Contract may (i) file with the Bankruptcy Court and appropriately serve an objection to the Cure Amount and (ii) request adequate assurance from the Buyer by filing and serving an appropriate request.

(f)     The Buyer may, at any time prior to the assumption of the Assumed Contracts, in its discretion, amend the list of Assumed Contracts and direct the Debtor to not assume any one or more of the Assumed Contracts, including any Prepetition Real Property Leases.

(g)     Notwithstanding the foregoing, and subject to the approval of the Bankruptcy Court, the Buyer may, at any time prior to the entry of a Final Order of the Bankruptcy Court closing the Bankruptcy Case, designate additional Contracts not previously assumed or rejected to be assumed by the Debtor and assigned to the Buyer.

2.6     Assumed Liabilities.

Assumed Liabilities shall be obligations of the Buyer.  "Assumed Liabilities" shall include:

(a)     All liabilities and obligations arising with respect to periods commencing on and after the Closing Date under or pursuant to any Assumed Contracts and which relate to the performance of the Assumed Contracts on and after the Closing Date (other than any obligations or liabilities that are the result of the breach of any Assumed Contract prior to or on the Closing Date);

(b)     All liabilities and obligations arising with respect to periods commencing on and after the Closing Date under or pursuant to any Assigned Postpetition Real Property Leases and which relate to the performance under the Postpetition Real Property Leases on and

Case 09-38166-pp    Doc 163-1    Filed 10/22/10    Page 14 of 26

Case 09-38166-pp    Doc 283-1    Filed 12/23/10    Page 14 of 73

Case 09-38166-pp    Doc 285-1    Filed 12/27/10    Page 37 of 96

after the Closing Date (other than any obligations or liabilities that are the result of the breach of any Postpetition Real Property Leases prior to or on the Closing Date);

(c)     Any and all obligations of Seller as a unit owner arising under the Declaration;

(d)     Any and all obligations of Seller owed to purchasers of any portion of the Real Property pursuant to the Purchase Contracts which by their terms are not being contested and which arise or are required to be performed after the Closing Date, to the extent such Purchase Contracts are assumed by Buyer;

(e)     Transaction Taxes; and

(f)     Cure Amounts.

2.7     Retained Liabilities.

The Seller shall retain the Retained Liabilities and the Buyer shall not assume or otherwise be responsible at any time for any liability, obligation, Indebtedness, Contract or commitment of the Seller with respect to the Retained Liabilities. "Retained Liabilities" shall mean every liability, obligation, debt or commitment of the Seller, whether known or unknown, whether absolute, contingent, liquidated or unliquidated, unaccrued, asserted, unasserted, or otherwise, and whether related to the Business, the Purchased Assets, the Excluded Assets or otherwise, other than the Assumed Liabilities, including:

(a)     any liability, obligation, debt or commitment of the Seller incident to, arising out of or incurred with respect to this Agreement and the transactions contemplated hereby which is in existence on or prior to the Closing Date and which relates to or arises under any environmental Law;

(b)     all of the Seller's liabilities, obligations, debts or commitments under any Employee Benefit Plans or relating to any Employees or former Employees, including without limitation, any wages, severance, bonuses, Claims, sick leave, unemployment benefits, pension benefits, employee stock options or profit-sharing plans, health care plans on benefits or any other employee plans or benefits of any kind for the Employees or former Employees or both;

(c)     all of the Seller's liabilities, obligations, debts or commitments under any employment, severance, retention or termination Contracts with any Employee; and

(d)     all of the Seller's accounts payable whether arising prior to or during the Bankruptcy Case.

2.8     Prorations.   Liability for Taxes and any and all other expenses relating to the Purchased Assets or the operation of the Business and which are not treated elsewhere herein will be allocated and prorated between the Buyer and the Seller as of the Closing Date.   If such amounts are not available at Closing, reasonable estimates of such prorations will be used.

2.9     The Seller's Chapter 11 Bankruptcy Case.

(a) Notwithstanding any conflicting or inconsistent provisions of this Agreement, the Seller's obligations under this Agreement and the transactions contemplated hereby are subject to and contingent upon the approval and authorization of the Bankruptcy Court. On or before October 1, 2010, the Seller shall file the Sale Procedures Motion pursuant to Sections 363 and 365 of the Bankruptcy Code seeking entry of the Sale Procedures Order containing, among other things, (i) sale procedures, (ii) scheduling an auction (the "Auction") and a hearing to consider the approval of the sale of the Purchased Assets (the "Sale Hearing"), and (iii) the form and manner of notice of the Sale Hearing.

(b) The Seller and the Buyer shall use commercially reasonable efforts to obtain entry of the Sale Procedures Order.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller hereby represents and warrants to the Buyer as of the Execution Date and, unless otherwise specifically provided in any representation or warranty and otherwise taking into account any changes in facts or circumstances occasioned by the operation of the Business and the Real Property in accordance with the terms hereof prior to the Closing Date, as set forth below. As used herein, the term "knowledge" or "Seller's knowledge" shall mean the actual (and not constructive or imputed) knowledge of Warren Barr and James Carroll:

3.1     Organization, Standing and Power.

The Seller is validly existing and in good standing under the laws of the jurisdiction of its organization and has full corporate or entity power and authority to conduct its business in the places and in the manner now being conducted. The Seller has full corporate or entity power and authority to own and operate the Purchased Assets owned or operated by it.

3.2     Authority.

Subject to the approval of the Bankruptcy Court, the Seller has the requisite power and authority to execute and to deliver this Agreement and the Ancillary Documents to which it is or will be a party and to perform its obligations hereunder and under any such Ancillary Documents. The execution and delivery by the Seller of this Agreement and the Ancillary Documents to which it is or will be a party, the performance of its obligations hereunder and thereunder and the consummation by it of the transactions contemplated hereby and thereby have been duly authorized by all necessary entity action on the part of the Seller, and no other entity action on the part of the Seller is necessary to authorize the execution and delivery of this Agreement, the Ancillary Documents or the consummation of the transactions contemplated hereby or thereby. Subject to the approval of the Bankruptcy Court, this Agreement has been duly and validly executed and delivered by the Seller and constitutes a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms. Subject to the approval of the Bankruptcy Court, each of the Ancillary Documents, when executed and delivered by the Seller, shall constitute a valid and binding agreement of the Seller, enforceable against the Seller, in accordance with its terms, subject (i) to applicable bankruptcy, insolvency,

fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and (ii) to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

### 3.3 No Conflict.

Subject to the approval of the Bankruptcy Court, neither the execution or delivery by the Seller of this Agreement or of any Ancillary Document to which it will be a party, nor the consummation of the transactions contemplated hereby or thereby, will result in the creation of any Lien Claim or Encumbrance upon or Interest in the Purchased Assets or Assumed Liabilities (except as specifically contemplated by this Agreement), does or will conflict with, result in any violation of, or constitute a default under any provision of (a) the Charter Documents of the Seller or (b) any Law. The Seller has complied in all material respects with all Applicable Laws and Orders in connection with the execution, delivery and performance of this Agreement, the Ancillary Documents and the transactions contemplated hereby and thereby.

### 3.4 Real Property.

With respect to the Real Property:

(a) The Seller owns fee title to the Real Property.

(b) The Seller has not received (i) any written notices from any governmental or quasi-governmental authority of any actual real property assessments, or (ii) any written notices from any governmental or quasi-governmental authority of any actual or threatened condemnation proceedings against the Real Property.

(c) Except as set forth on Schedule 3.4(c), there are no pending litigation or administration actions (other than the Bankruptcy Case or any adversary proceedings undertaken in connection therewith), and the Seller has not received any notice threatening in writing any litigation or administrative action which, in any such case, if adversely determined, is likely to have a Material Adverse Effect on title to the Real Property or the Seller's ability to consummate the transactions contemplated by this Agreement.

(d) Other than as set forth in Schedule 3.4(d), the Seller has not received prior to the Closing Date any written notification from any governmental or quasi-governmental authority (i) that the Real Property is in violation of any applicable fire, health, building, use, occupancy or zoning Laws where such violation remains outstanding, or (ii) that any work is required to be done by any governmental or quasi-governmental authority upon or in connection with the Real Property, where such work remains outstanding.

(e) True, correct and complete copies of any Prepetition or Postpetition Real Property Leases, including any amendments thereto, are in Seller's possession as required herein.

### 3.5 Contracts.

True, correct and complete copies of all Contracts to which the Seller is a party and all amendments thereto have been made available to the Buyer by the Seller as required herein. Except as permitted herein, none of the Contracts has been materially modified since such copies were made available to the Buyer. To the Seller's knowledge, except for defaults caused by the commencement of the Bankruptcy Case, each Contract is valid, binding upon the Seller and in full force and effect in all material respects and no material default or event of default by the Seller or, any other party thereto, exists under any of the Contracts that is material to this Agreement or the transactions contemplated by this Agreement. To Seller's knowledge, no party to any of the Contracts has given notice of default or termination. The Seller has not made an assignment or transfer of any of its rights under any of the Contracts except collateral assignments to secured lenders which are to be released at or prior to Closing.

3.6    Intellectual Property.

To the knowledge of the Seller, the Seller owns the rights to use, in the Business, all of the Intellectual Property, free and clear of all Liens, Claims or Interests. Such Intellectual Property will be conveyed free and clear of all Liens Claims and Interests pursuant to the Sale Order, and, to the knowledge of the Seller, the use of the Intellectual Property in the conduct of the Business, as currently conducted, does not conflict with the rights of others in any manner. There are no licenses or Contracts outstanding or effective granting any other Person any right to use, operate under, license or sublicense any of the Intellectual Property. The Seller has not received to Seller's knowledge any written notice or claim that any of the Intellectual Property infringes upon or conflicts with the rights of any other Person in any manner.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF BUYER

The Buyer represents and warrants to the Seller as of the Execution Date and the Closing Date:

4.1    Organization, Standing and Power.

The Buyer is organized, validly existing, and in good standing under the laws of its jurisdiction of formation and has the requisite power and authority to carry on its business as now being conducted and to effect the transactions contemplated hereunder.

4.2    Authority.

The Buyer has the requisite power and authority to execute and to deliver this Agreement and the Ancillary Documents to which it is or will be a party and to perform its obligations hereunder and under any such Ancillary Documents. The execution and delivery by the Buyer of this Agreement and the Ancillary Documents to which it is or will be a party, the performance of its obligations hereunder and thereunder and the consummation by it of the transactions contemplated hereby and thereby have been (or will be at the time of execution thereof) duly authorized by all necessary entity action on the part of the Buyer, and no other action on the part of the Buyer is necessary to authorize the execution and delivery of this Agreement, the Ancillary Documents or the consummation of the transactions contemplated hereby or thereby. This Agreement has been duly and validly executed and delivered by the Buyer and constitutes a

valid and binding obligation of the Buyer, enforceable against the Buyer in accordance with its terms, subject (a) to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies and (b) to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity). Each of the Ancillary Documents, when executed and delivered by the Buyer, shall constitute a valid and binding agreement of the Buyer, enforceable against the Buyer in accordance with its terms, subject (i) to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and (ii) as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

4.3    Consents and Approvals; No Violation.

The execution and delivery of this Agreement by the Buyer do not, and the consummation of the transactions contemplated hereby and compliance with the provisions hereof will not, result in any violation of, or default (with or without notice or lapse of time, or both) under, or give to others a right of termination, cancellation or acceleration of any obligation or the loss of a material benefit under, or result in the creation of any Lien upon any of the properties or assets of the Buyer under, any provision of (a) the Charter Documents of the Buyer, (b) any loan or credit agreement, note, bond, mortgage, indenture, lease or other agreement, instrument, permit, concession, franchise or license applicable to the Buyer, or (c) any Law applicable to the Buyer or any of its respective properties or assets, other than, in the case of clauses (b) or (c), any such violations, defaults, rights or Liens that, individually or in the aggregate, would not prevent the consummation of any of the transactions contemplated hereby in accordance with the terms of this Agreement. Except for the Governmental Approvals, no filing or registration with, or authorization, consent or approval of, any Governmental Authority is required by or with respect to the Buyer in connection with the execution and delivery of this Agreement by the Buyer or is necessary for the consummation of the transactions contemplated by this Agreement.

4.4    Actions and Proceedings.

There are no actions, suits, labor disputes or other litigation, legal or administrative proceedings or governmental investigations pending or, to the knowledge of the Buyer, threatened against or affecting the Buyer or any of its present or former officers, directors, employees, consultants, agents or shareholders, as such, or any of its properties, assets or business relating to the transactions contemplated by this Agreement or which could have the effect of delaying or prohibiting the consummation of the transactions contemplated by this Agreement.

4.5    AS IS SALE.

BUYER ACKNOWLEDGES THAT AS OF THE DATE HEREOF, BUYER IS FAMILIAR WITH THE PURCHASED ASSETS, THE LIABILITIES AND THE OPERATIONS OF THE SELLER. BUYER UNDERSTANDS THAT, EXCEPT AS SPECIFICALLY SET FORTH IN ARTICLE III OF THIS AGREEMENT, NEITHER THE    SELLER    NOR    ITS    REPRESENTATIVES    HAVE    MADE    ANY

REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AND THAT THE PURCHASED ASSETS, THE ASSUMED LIABILITIES AND THE BUSINESSES BEING TRANSFERRED TO BUYER ARE TO BE CONVEYED HEREUNDER "AS IS, WHERE IS" ON THE CLOSING DATE, AND IN THEIR THEN EXISTING CONDITION. BUYER IS RELYING ON ITS OWN INVESTIGATION OF THE REAL PROPERTY AND THE BUSINESS IN ENTERING INTO THIS AGREEMENT.

## ARTICLE V.
## COVENANTS

5.1    <u>Access</u>.

From the Execution Date until the earlier of the Closing Date or the date this Agreement is terminated in accordance with the terms hereof, the Seller will upon reasonable notice, during normal business hours, to the extent reasonably requested by the Buyer give the Buyer and its representatives, employees, counsel and accountants access to the Real Property (subject to the rights of lessees thereof) and Books and Records of the Seller relating to the Purchased Assets. Buyer shall repair any damage to the Real Property caused by its entry thereon and shall indemnify Seller against any claims arising from or related to Buyer's entry onto the Property.

5.2    <u>Operation of Business</u>.

Except as contemplated by this Agreement and to the extent not inconsistent with the Bankruptcy Code, the operation and information reporting requirements of the Office of the United States Trustee (the "<u>UST</u>"), and subject to any Order or direction of the Bankruptcy Court, from and after the Execution Date through the Closing Date, during the period from the date of this Agreement to the Closing, the Seller shall operate the Purchased Assets and conduct the Business in the ordinary course of business in a manner consistent with its prior operating practices and the leasing parameters agreed to between the Seller and the Bank. Without limiting the generality of the foregoing, prior to the Closing and subject to the requirements of the Bankruptcy Code, the UST, and any Orders entered by the Bankruptcy Court, the Seller shall not, and shall cause its officers, directors, employees, representatives and agents not to:

(a)    sell, lease, dispose of or otherwise distribute any material portion of the Purchased Assets without the express consent of the Buyer, except in the ordinary course of leasing and selling residential units;

(b)    mortgage or pledge any of the Purchased Assets or subject any Purchased Assets to any Lien;

(c)    take or omit to take any action that would require disclosure under Article III result in a breach of any of the representations, warranties or covenants made by the Seller in this Agreement; or

(d)    pay any dividends or make any distributions to its members.

Additionally, from the date of this Agreement to the Closing Date, the Seller shall promptly consult with the Buyer about any material matters concerning the Purchased Assets or the Business.

### 5.3    Notification.

Prior to the Closing, the Seller shall notify the Buyer, and the Buyer shall notify the Seller, of any litigation, arbitration, appeal or administrative proceeding pending, or, to its knowledge, threatened against the Seller or the Buyer, as the case may be, which challenges the transactions contemplated hereby. Prior to the Closing, Seller shall consult with Buyer about any matter arising after the Execution Date which is reasonably anticipated to have a Material Adverse Effect on the Real Property or the Business.

### 5.4    All Reasonable Efforts.

Without limiting the ability of either party to use discretion in exercising its rights pursuant to this Agreement, prior to the Closing, each of the parties shall use reasonable efforts to (i) satisfy promptly all conditions required hereby to be satisfied by such party in order to expedite the consummation of the transactions contemplated hereby and (ii) take, or cause to be taken, all action, and to do, or cause to be done as promptly as practicable, all things necessary, proper or advisable under Applicable Laws and regulations to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement.

### 5.5    Further Assurances.

From time to time from and after the date of this Agreement, including following the Closing, the Buyer and the Seller shall each execute, acknowledge and deliver such additional documents or instruments and take such other action as the Buyer or the Seller, as the case may be, may reasonably request to more effectively accomplish the transactions contemplated by this Agreement.

### 5.6    Publicity.

Seller and Buyer agree that any press release or public statement they may make with respect to the transactions contemplated by this Agreement and related matters shall contain no disparagement of the other party and shall portray the transaction and the conduct of the Chapter 11 case and related matters as a reasonable business transaction beneficial to both the Seller and the Buyer conducted in good faith by both the Seller and the Buyer.

### 5.7    Confidentiality.

(a)    Each party hereto acknowledges that the other party has legitimate and continuing proprietary interests in the protection of its confidential information and that the parties have invested substantial sums and will continue to invest substantial sums to develop, maintain and protect such confidential information.   Except as may be required by the Bankruptcy Code and Bankruptcy Rules, prior to and after the Closing, each party hereto agrees not to disclose, furnish or make accessible to anyone or use for its own benefit (other than as contemplated hereby) any trade secrets or other confidential or proprietary information (the

"Confidential Information") of another party hereto relating to the Seller, the Buyer and/or their respective businesses or the other parties, including information obtained by or revealed to such party during any investigations, negotiations or review relating to this Agreement and any other document contemplated hereby or thereby or any past or future actions taken in connection with, pursuant to, in accordance with, or under this Agreement, including any business plans, marketing plans, financial information, strategies, systems, programs, methods, and computer programs. Confidential Information shall include (i) all analyses, compilations, data, studies, notes, interpretations, memoranda or other documents evaluating the transactions contemplated by this Agreement (collectively, "Evaluation Materials") that have been or will be prepared by the Buyer and its Representatives in connection with the transactions contemplated by this Agreement, (ii) any proposals, indications of interest or other materials (collectively, the "Bid Materials") submitted by the Buyer and its Representatives to the Seller and its Representatives that relate to the Buyer's involvement in the transactions contemplated by this Agreement, and, (iii) financial information about the Real Property and the conduct of the Business and Seller's marketing strategies for the Real Property (collectively, the "Protected Materials") Confidential Information shall not include any information that (i) at the time of disclosure is generally available to the public other than as a result of a disclosure that would constitute a breach of this Agreement or (ii) is or becomes available on a non-confidential basis from a source other than the Seller and its Representatives or the Buyer and its Representatives that was not prohibited from disclosing such information by a legal, contractual or fiduciary obligation.

(b)     Subject to any reasonable need to communicate any Confidential Information to facilitate approval of the transactions contemplated by this Agreement, the Confidential Information shall be kept strictly confidential by the parties and shall not be disclosed to any person except as in the opinion of outside counsel is required by applicable law, regulation or legal process, and only after compliance with the procedures contained in this Section 5.7, except that the Buyer, on the one hand, and the Seller, on the other hand, may disclose Confidential Information to the Buyer and its Representatives, in the case of disclosures by the Buyer, and to the Representatives of the Seller, in the case of disclosures by the Seller; provided, however, that, except as provided in Section 5.7(d), any Person to whom Confidential Information is so disclosed shall (A) have a need to know such information for purposes of consummating the transactions contemplated by this Agreement and (B) first agree to be bound by the provisions of this Section 5.7. If any party becomes legally compelled (including by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) to disclose any of the Confidential Information, the party subject to such legal process shall provide the other parties with prompt prior written notice of such requirement so that the other parties may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, the party subject to the legal process agrees to disclose only that portion of the Confidential Information that they are advised by outside counsel is legally required to be disclosed and to take all reasonable steps to preserve the confidentiality of the Confidential Information.

(c)     The Seller shall be responsible for any breach of this Section 5.7 by its Representatives, and the Buyer shall be responsible for any breach of this Section 5.7 by its Representatives.

(d)     It is acknowledged and agreed by the parties that (i) this Agreement and any Ancillary Documents may be filed by the Seller with the Bankruptcy Court and none of the restrictions contained in this Section 5.7 will be applicable to any documents so filed, (ii) such of the Protected Materials as counsel for the Seller determines are required or advisable to be presented to the Bankruptcy Court at any hearing before the Bankruptcy Court may be disclosed at such hearing without violating this Section 5.7 and (iii) the Seller may discuss the terms of the Agreement and the negotiation process with the Buyer with the Bankruptcy Court, the Committee, material witnesses of the Seller or any other material creditors of the Seller and its advisors, without violating this Section 5.7.

(e)     Except as required by law and as may be reasonably required to obtain the approval of the Bankruptcy Court and otherwise facilitate the completion of the transactions contemplated by this Agreement, the schedules annexed hereto shall not be disclosed to the public without the prior consent of each of the parties hereto.

(f)     If this Agreement is terminated pursuant to Section 7.1, the parties and their Representatives will promptly return to the other parties or destroy all Confidential Information obtained from the other parties (or their Representatives, as applicable) and all copies, extracts or other reproductions thereof in whole or in part.  Notwithstanding the return or destruction of the Confidential Information, the parties will continue to be bound by the provisions of this Section 5.7.

(g)     Notwithstanding anything in this Agreement to the contrary, the parties hereto expressly agree that the Seller's obligations under this Section 5.7 regarding Confidential Information shall mean and include only the Confidential Information of the Buyer, and the Buyer's obligations under this Section 5.7 regarding Confidential Information shall mean and include only the Confidential Information of the Seller.

5.8     Transaction Taxes.

The Buyer and the Seller shall cooperate in the preparation and timely delivery of any certificate or instrument that would entitle either party to claim an exemption from any state and local transfer, recording, stamp and other transfer or transaction Tax that may be imposed by reason of the transactions contemplated by this Agreement (collectively, "Transaction Taxes").  To the extent a Transaction Tax is still payable after giving effect to any available exemption, the Buyer shall pay the Transaction Taxes, if any.

5.9     Notice of Nonsatisfaction of Closing Condition.

The Buyer and the Seller shall, within three (3) Business Days of discovery thereof, notify the other party of any fact or circumstance that would cause (a) its representations and warranties to be untrue in any material respect, (b) its covenants to be unlikely to be fulfilled prior to or on the Closing Date or (c) the conditions in Section 6.1 to be unsatisfied; provided, however, that inclusion or omission of any such fact, circumstance or condition in or from any such written notification shall not be deemed a waiver of any rights under this Agreement, and shall not alter or otherwise affect the representations, warranties, covenants, conditions or agreements contained in this Agreement.

5.10  Cooperation.

The Buyer shall reasonably cooperate with the Seller in furnishing to the Bankruptcy Court evidence of adequate assurance by the Buyer of its future performance under the Assumed Contracts, and to otherwise perform and discharge the Assumed Liabilities, and evidence that the Buyer has the financial wherewithal to timely close the transactions contemplated by this Agreement. In addition, the Buyer and Seller shall reasonably cooperate and use their respective best efforts to obtain the approval of the Sale Procedures Order and the Sale Order.

5.11  Access to Records.

From and after the Closing Date, the Seller on the one hand and the Buyer on the other hand shall afford each other and their respective counsel, accountants and other representatives such access to records in respect of the Seller's businesses which, after the Closing, are in the custody or control of the other party and which such party reasonably requires in order to comply with its obligations under Applicable Law, including audits by Tax authorities, or which the Buyer reasonably requires to comply with its material obligations under the Assumed Liabilities or the Assumed Contracts. The Buyer will retain all records that the Buyer may have, if any, relating and material to the operation of the Seller's business and the Purchased Assets prior to the Closing for a period of one (1) year after the Closing Date.

5.12  Notice of Sale.

Notice of this Agreement and notice of the Sale Order and the hearing therefor shall be duly and properly given by actual notice by the Bank to all known creditors and known parties in interest in the Bankruptcy Case, including any known parties holding consensual or nonconsensual Liens on the Purchased Assets, the lessors on the material leases, the non-Seller parties to the Assumed Contracts being assumed pursuant to this Agreement, and applicable taxing and Governmental Authorities.

5.13  Risk of Loss.

Subject to the provisions of any loan agreement between Seller and the Bank, in the event of any damage, destruction or loss of or to any of the Purchased Assets on or prior to the Closing Date, where the reasonably estimated cost to repair or restore the Purchased Assets is in excess of $1,000,000.00, then at Buyer's sole option, (i) Buyer may elect not to close; or (ii) Buyer may choose to close the transaction and the Purchase Price shall be reduced by the Loss Repair Amount.

5.14  Document Delivery.

As soon as practicable following the Execution Date, but in all events five (5) days prior to the date bids are due under the Sale Procedures Order, Seller shall deliver to Buyer all of the following documentation in Seller's possession: copies of any and all leases; Contracts; environmental reports and related filings and test results; title evidence and surveys of the Real Property; engineering data, soil and geotechnical tests; plans and specifications for any building, grading, drainage and landscaping installed by Seller; documentation relating to public infrastructure, services or utilities; and condominium documents.

5.15    Title Policy.

With the cooperation of and at the expense of the Bank Seller shall cause to be provided, to Buyer, on the Closing Date, a title policy from Title Company insuring title in Purchaser substantially in the form attached as Schedule 5.15 hereto.

## ARTICLE VI.
## CONDITIONS TO THE OBLIGATIONS OF THE PARTIES

6.1    Conditions to Each Party's Obligations.

The respective obligations of each party to effect the transactions contemplated by this Agreement, unless waived by the other parties hereto, shall be subject to the fulfillment on or prior to the Closing Date of the following conditions:

(a)    No order, writ, injunction or decree shall have been entered and be in effect that restrains, enjoins or invalidates, or otherwise materially adversely affects the transactions contemplated by this Agreement, and no action, suit or other proceeding shall be pending or threatened that has a reasonable likelihood of resulting in any such order, writ, injunction or decree.

(b)    The Bankruptcy Court shall enter an Order (the "Sale Order") providing for (i) the sale of the Purchased Assets to Buyer free and clear of all Claims (other than Assumed Liabilities) and Liens and (ii) approving the assumption and assignment of the Assumed Contracts, in form and substance acceptable to the Buyer approving the transactions contemplated hereby and the terms and conditions of this Agreement, finding that notice of the hearing concerning approval of the transactions contemplated hereunder was given in accordance with the Bankruptcy Code and constitutes such notice as is appropriate under the particular circumstances, and the Buyer is a "good faith" purchaser entitled to the protections afforded by Section 363(m) of the Bankruptcy Code, and the Sale Order shall become a Final Order, as defined herein.

6.2    Conditions to Obligations of the Buyer.

The obligations of the Buyer under this Agreement to consummate the transactions contemplated hereby to be consummated at the Closing shall be subject to the satisfaction, at or prior to the Closing, of the following conditions, which may be waived in writing at the option of the Buyer in its sole discretion:

(a)    All representations and warranties of the Seller in Article III of this Agreement shall be true, complete and correct in all material respects in each case when made and on and as of the Closing Date as if made on and as of the Closing Date taking into account any changes in facts or circumstances occasioned by the operation of the Business and the Real Property in accordance with the terms hereof prior to the Closing Date, other than any such representations or warranties that expressly speak only as of an earlier date, which shall be true, complete and correct in all respects (with respect to representations and warranties qualified or limited by materiality) or in all material respects (with respect to representations and warranties not so qualified or limited), as of such earlier date;

(b)     The Seller shall have executed and delivered the documents required to be executed and delivered by it pursuant to Section 2.4(b) hereof;

(c)     All of the material terms, covenants and conditions in this Agreement to be complied with and performed by the Seller on or prior to the Closing Date shall have been complied with or performed in all material respects; provided that as to any breach thereof occurring prior to the Closing Date, Buyer shall provide Seller written notice thereof within three (3) Business Days after learning thereof and Seller shall have a period of ten (10) Business Days to remedy such breach;

(d)     The Title Company shall deliver the Title Policy in the form required under Section 5.15; and

(e)     If requested by the Buyer, the Seller shall hold the meeting of the Condominium Association required by Section 4.03 of the Declaration and shall have two directors designated by the Buyer appointed to the board of the Condominium Association, which appointment shall be conditioned upon, and effective upon, Closing. Buyer agrees that notice of the meeting shall not be given until after the Sale Order is entered and the meeting shall not be held until the Sale Order is not subject to any stay following expiration of the period provided for in Rules of Bankruptcy Procedure 6004(g) or 7062, unless the Bankruptcy Court orders that no such stay shall be in effect and (at the Bank's election) the transaction is consummated with such 14 day period. In connection with such meeting, Buyer shall prepare the form of required notice of meeting and shall cause such notice to be served as required by applicable Law and the Declaration.

6.3     Conditions to Obligations of the Seller.

The obligations of the Seller under this Agreement to consummate the transactions contemplated hereby to be consummated at the Closing shall be subject to the satisfaction, at or prior to the Closing, of all of the following conditions, any one or more of which may be waived in writing at the option of the Seller in its sole discretion:

(a)     all representations and warranties of the Buyer in Article IV of this Agreement shall be true, complete and correct in all respects (with respect to representations and warranties qualified or limited by materiality) or in all material respects (with respect to representations and warranties not so qualified or limited), in each case when made and on and as of the Closing Date as if made on and as of the Closing Date, other than any such representations or warranties that expressly speak only as of an earlier date, which shall be true, complete and correct in all respects (with respect to representations and warranties qualified or limited by materiality) or in all material respects (with respect to representations and warranties not so qualified or limited), as of such earlier date;

(b)     The Buyer shall have executed and delivered the documents required to be executed and delivered by it pursuant to Section 2.4(a) hereof; and

(c)     All of the terms, covenants and conditions in this Agreement to be complied with and performed by the Buyer on or prior to the Closing Date shall have been complied with or performed in all material respects.

## ARTICLE VII.
## TERMINATION

7.1     Termination.

This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing:

(a)     by mutual consent of the Seller and the Buyer;

(b)     by the Buyer (provided that the Buyer is not then in material breach of any provision of this Agreement):

(i)     if the Bankruptcy Court has not entered the Sale Order and such order does not become a Final Order by December 28, 2010, or the Sale Order is entered by such date but (A) is stayed by order of the Bankruptcy Court or of some other federal district or appeals court (and such stay is not terminated by December 28, 2010) or (B) ceases to be effective and is not reinstated on or before January 28, 2010;

(ii)     upon the conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code, the dismissal of the Bankruptcy Case, or any similar commencement of liquidation proceedings relating to the Seller, other than as contemplated herein;

(iii)     if the Closing does not occur on or before December 31, 2010, unless the failure to consummate the Closing is due to the failure of the Buyer to perform any of its obligations under this Agreement to the extent required to be performed by the Buyer on or prior to the Closing Date;

(iv)     upon the entry of an order of the Bankruptcy Court for the appointment of a trustee or examiner with managerial powers, other than at the request of the Buyer or any of its Affiliates, under Bankruptcy Code Section 1104 and such trustee or examiner takes any action to interfere with or impair the transactions contemplated by this Agreement;

(v)     if any event, circumstance, condition, fact, effect or other matter has occurred or exists which would, or would be reasonably likely to, give rise to the failure of any of the conditions to the obligations of the Buyer set forth in Section 6.1 and Section 6.2 and cannot be cured within twenty Business Days after the giving of notice to the Seller;

(vi)     if the Buyer is not determined to be either the winning bidder at the Auction pursuant to the Sale Procedures Order or a back up bidder with whom the sale is consummated pursuant to the Sale Procedures Order; OR

(c)     by the Seller (provided that the Seller is not then in material breach of any provision of this Agreement):

(i)     if all of the conditions in Section 6.1 and Section 6.2 have been satisfied, and the Buyer fails to consummate the transactions contemplated by this Agreement in accordance with the terms hereof;

(ii)     if any event, circumstance, condition, fact, effect or other matter has occurred or exists which would, or would be reasonably likely to, give rise to the failure of any of the conditions to the obligations of the Seller set forth in Section 6.1 or Section 6.3 and cannot be cured within thirty Business Days after the giving of notice to the Buyer.

### 7.2    Procedure and Effect of Termination.

In the event of termination of the transactions contemplated hereby pursuant to Section 7.1, written notice thereof shall forthwith be given to the other party to this Agreement, and this Agreement shall terminate (subject to the provisions of this Section 7.2) and the transactions contemplated hereby shall be abandoned, without further action by either of the parties hereto and without liability of any party to the other.  If this Agreement is terminated as provided herein:

(a)     upon request therefore, each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether obtained before or after the execution hereof, to the party furnishing the same; and

(b)     no party hereto shall have any liability or further obligation under this Agreement, except that the provisions of Sections 5.7, 7.2, 8.14 and 8.16 shall survive any termination and remain in full force and effect; provided, however, that this lack of any liability or further obligation on account of a termination hereunder shall not be construed in any way to excuse liability or obligations arising as a result or consequence of either party's breach of this Agreement.

### ARTICLE VIII.
### GENERAL PROVISIONS

### 8.1    Survival of Representations and Warranties.

The representations and warranties set forth in this Agreement or in any schedule, exhibit or instrument delivered pursuant to this Agreement by the Seller shall terminate upon Closing.

### 8.2    Notices.

All notices, requests, demands and other communications hereunder (a "Notice") shall be in writing and deemed to be duly given, (i) when delivered by hand, with a record of receipt, (ii) the fourth day after mailing, if mailed by certified or registered mail, return receipt requested with postage prepaid, (iii) the day delivered by a nationally recognized overnight courier, with a record of receipt, or (iv) the day of transmission, with confirmation of receipt, if delivered by facsimile or telecopy during regular business hours (which regular business hours shall be 9:00 am – 5:00 pm on each Business Day), or the day after transmission, with confirmation of receipt, if delivered by facsimile or telecopy after regular business hours, to the parties at the following

addresses or telecopy numbers (or to such other address or telecopy number as a party may have specified by the notice given to the other party pursuant to this provision):

| | |
|---|---|
| If to Seller: | Renaissant Development Group<br>2215 S. York Road, Suite 302<br>Oak Brook, Illinois 60523<br>Attention: Warren Barr |
| And a copy to: | Meltzer, Purtill & Stelle LLC<br>300 South Wacker Drive<br>Suite 3500<br>Chicago, Illinois 60606<br>Fax No.: (312) 987-9854<br>Attention: Forrest B. Lammiman |
| If to Buyer: | Amalgamated Bank, Trustee of Longview Ultra<br>Construction Loan Investment Fund<br>275 Seventh Ave.<br>New York, New York 10001<br>Attention: James T. Freel, Senior Vice<br>President/Chief Real Estate Officer |
| And a copy to: | Reinhart Boerner Van Deuren, S.C.<br>1000 North Water Street, Suite 2100<br>Milwaukee, Wisconsin 53202<br>Fax No.: (414) 298-8097<br>Attention: Peter C. Blain |
| and | Nixon Peabody LLP<br>100 Summer Street<br>Boston, MA 02110<br>Fax No.: 866-382-5868<br>Attention: Mark N. Berman |

or to such other addresses as either party may provide to the other in writing.

8.3   <u>Section and Other Headings</u>.

Section or other headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

8.4   <u>Waiver</u>.

Any term or condition of this Agreement may be waived at any time by the party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by or on behalf of the party waiving such term or condition. No waiver by any party of any term or condition of this Agreement, in any one or more instances, shall be

deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future of the Buyer. All remedies, either under this Agreement or by Law or otherwise afforded, will be cumulative and not alternative.

8.5    Entire Agreement; Disclosure Schedules.

This Agreement, which includes the annex, exhibits and schedules hereto, supersedes any other agreement, whether written or oral, that may have been made or entered into by any party relating to the matters contemplated hereby and constitutes the entire agreement by and among the parties hereto.

8.6    Amendments, Supplements, Etc.

This Agreement may be amended or supplemented at any time by additional written agreements as may mutually be determined by the Buyer and the Seller to be necessary, desirable or expedient to further the purposes of this Agreement or to clarify the intention of the parties.

8.7    No Rights of Third Parties.

Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any Person other than the parties hereto any rights or remedies under or by reason of this Agreement or any transaction contemplated hereby.

8.8    Enforcement.

The laws of the State of Wisconsin shall govern the interpretation, validity, performance and enforcement of this Agreement, without reference to any conflict of law or choice of law provisions therein.

8.9    Invalid Provisions.

If any provision of this Agreement (other than Article VII of this Agreement or any part or provision thereof) is held to be illegal, invalid, or unenforceable under any present or future Law, and if the rights or obligations under this Agreement of the Seller on the one hand and the Buyer on the other hand will not otherwise be materially and adversely affected thereby, (a) such provision shall be fully severable; (b) this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof; (c) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement; and (d) in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of this Agreement a legal, valid, and enforceable provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible.

8.10    Successors and Assigns.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors (including any trustee, receiver, receiver-manager, interim receiver or similar officer appointed for the Seller) and permitted assigns, but shall not be assignable or

delegable by the Seller without the prior written consent of the Buyer or by court order. Buyer may assign this Agreement to any third party; provided, however, that Buyer shall remain fully liable with regard to Buyer's obligations hereunder notwithstanding any such assignment.

8.11    Counterparts.

This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and either of the parties hereto may execute this Agreement by signing any such counterpart.

8.12    Facsimile Signature.

This Agreement may be executed and accepted by facsimile signature and any such signature shall be of the same force and effect as an original signature.

8.13    Further Assurances.

Both parties agree that either will execute such further documentation or take such further actions as the other party may reasonably request to effectuate the transfer of the Purchased Assets and implement this Agreement.

8.14    Fees and Expenses.

Except as otherwise provided herein, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby including the fees and disbursements of counsel, financial advisors and accountants, shall be paid by the party incurring such costs and expenses.

8.15    WAIVER OF JURY TRIAL.

THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE ANY RIGHT TO TRIAL BY JURY IN CONNECTION WITH ANY DISPUTE RELATED IN ANY WAY TO BUYER'S SUBMISSION OF THE BID MATERIALS OR THIS AGREEMENT.

8.16    Exclusive Jurisdiction.

Without limiting any party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (b) any and all claims, actions, causes of action, suits and proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 8.2 hereof.

8.17    Computation of Days.

In computing any time period prescribed or allowed in this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is not a Business Day, or, when the act to be done is the filing of a paper in court, a day on which weather or other conditions have made the clerk's office inaccessible, in which event the period runs until the end of the next day which is not one of the aforementioned days.

8.18    Time of Essence.

With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

IN WITNESS WHEREOF, the parties have executed this Asset Purchase Agreement as of the date set forth above.

AMALGAMATED BANK, as Trustee of
Longview Ultra Construction Loan Investment
Fund f/k/a Longview Ultra I Construction Loan
Investment Fund

By: _____
Name: JAMES FREEL
Title: SENIOR VICE PRESIDENT

RENAISSANT LAFAYETTE LLC, as Debtor
and Debtor-in-Possession

By: _____
Name:
Title:

REINHART\4073545_12RWH\BMH DKDB\832

## Exhibit A

## Assignment and Assumption Agreement for Assumed Contracts

This ASSIGNMENT AND ASSUMPTION AGREEMENT (the "Agreement") is made as of the __ day of _____, 2010, by and between RENAISSANT LAFAYETTE LLC, a Wisconsin limited liability company, as debtor and debtor-in-possession (the "Seller,") and AMALGAMATED BANK, a bank organized under the laws of the State of New York, as Trustee of Longview Ultra Construction Loan Investment Fund f/k/a Longview Ultra I Construction Loan Investment Fund, a collective trust fund organized under the laws of the State of New York (the "Buyer").

RECITALS:

A.    Seller and Buyer are parties to that certain Asset Purchase Agreement, dated [_____], 2010 (the "APA").

B.    Pursuant to the APA, Seller and Buyer are entering into this Agreement.

NOW THEREFORE, in consideration of the recitals, the consummation of the transactions contemplated by the APA, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    <u>Assignment</u>.  Seller hereby sells, transfers, assigns conveys, and delivers to Buyer all of Seller's right, title and interest in, to, and under the Assumed Contracts, including security deposits held pursuant to any Assumed Contracts.

2.    <u>Assumption</u>.  Buyer hereby assumes and agrees to pay, perform, and discharge the Assumed Liabilities.

3.    <u>The APA</u>.  Nothing contained in this Agreement shall be deemed to supersede or otherwise affect any of the obligations, agreements, covenants, representations, or warranties of Seller contained in the APA.  Capitalized terms not otherwise defined herein have the meanings assigned to them in the APA.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized representatives as of the date first stated above.

RENAISSANT LAFAYETTE LLC:

_____

By_____
Name:_____
Title:_____


AMALGAMATED BANK:

_____

By_____
Name:_____
Title:_____

**Exhibit B**

**Assignment Agreement for Postpetition Real Property Leases**

This ASSIGNMENT AND ASSUMPTION OF LEASE (the "Agreement") is made as of the __ day of _____, 2010, by and between RENAISSANT LAFAYETTE LLC, a Wisconsin limited liability company, as debtor and debtor-in-possession (the "Seller,") and AMALGAMATED BANK, a bank organized under the laws of the State of New York, as Trustee of Longview Ultra Construction Loan Investment Fund f/k/a Longview Ultra I Construction Loan Investment Fund, a collective trust fund organized under the laws of the State of New York (the "Buyer").

RECITALS:

A.     Seller and Buyer are parties to that certain Asset Purchase Agreement, dated [_____], 2010 (the "APA").

B.     Pursuant to the APA, Seller and Buyer are entering into this Agreement.

NOW THEREFORE, in consideration of the recitals, the consummation of the transactions contemplated by the APA, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     Assignment.  Seller hereby sells, transfers, assigns conveys, and delivers to Buyer all of Seller's right, title and interest in, to, and under the Postpetition Real Property Leases, including security deposits held pursuant to any Postpetition Real Property Leases.

2.     Assumption.  Buyer hereby assumes and agrees to pay, perform, and discharge the Assumed Liabilities related to the Postpetition Real Property Leases.

3.     The APA.  Nothing contained in this Agreement shall be deemed to supersede or otherwise affect any of the obligations, agreements, covenants, representations, or warranties of Seller contained in the APA.  Capitalized terms not otherwise defined herein have the meanings assigned to them in the APA.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized representatives as of the date first stated above.

RENAISSANT LAFAYETTE LLC:

_____

By_____
Name:_____
Title:_____


AMALGAMATED BANK:

_____

By_____
Name:_____
Title:_____

REINHART\4075545_14RWH:BMH 10/18/10 2

## Exhibit C

### Assignment for Intellectual Property

This Assignment of Intellectual Property is made as of the ___ day of ___, 2010 by RENAISSANT LAFAYETTE LLC, a Wisconsin limited liability company, as debtor and debtor-in-possession (the "Assignor,") for the benefit of AMALGAMATED BANK, a bank organized under the laws of the State of New York, as Trustee of Longview Ultra Construction Loan Investment Fund f/k/a Longview Ultra I Construction Loan Investment Fund, a collective trust fund organized under the laws of the State of New York (the "Assignee").

### RECITALS:

A.    Assignor is the owner of the trade name described on Annex 1 (the "Intellectual Property"), attached hereto.

B.    Assignee desires to acquire from Assignor the Intellectual Property and the goodwill evidenced thereby.

In consideration of one dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby sells, assigns, and transfers to Assignee, Assignor's entire right, title, and interest in and to the Intellectual Property, the goodwill of the business symbolized thereby, and all claims and demands, if any, that Assignor may have in connection with the Intellectual Property arising on or before the date of this Assignment.

Assignor is contemporaneously herewith transferring to Assignee substantially all of the assets, and Assignee will succeed to the business of Assignor, to which the Intellectual Property pertains.

The terms and provisions of this Assignment of Intellectual Property shall inure to the benefit of the Assignee and its successors and assigns.

IN WITNESS WHEREOF, Assignor has caused this Assignment of Intellectual Property to be executed by its authorized representative as of the date first stated above.

RENAISSANT LAFAYETTE LLC:

_____

By_____
Name:_____
Title:_____

**Annex 1**

Trade Name: Park Lafayette

REINHART\075545_14RWH:BMH 10/18/10

## Exhibit D

## Assumed Contracts

| Date | Counterparty | Term | Description of Services | Cure Amount |
|------|--------------|------|-------------------------|-------------|
| 9/11/2007 | Capitol Infrastructure, LLC | 9/11/07 – 9/11/17 | Provide and maintain infrastructure to enable video and data services; arrange with service providers to provide such services. | $2,298 |

## Exhibit E

## Cure Amounts

The Cure Amount for the Assumed Contract is listed on Exhibit D.

**Exhibit F**

**Bill of Sale for Purchased Assets**

This Bill of Sale is made as of the ___ day of ___, 2010 by RENAISSANT LAFAYETTE LLC, a Wisconsin limited liability company, as debtor and debtor-in-possession (the "Seller,") for the benefit of AMALGAMATED BANK, a bank organized under the laws of the State of New York, as Trustee of Longview Ultra Construction Loan Investment Fund f/k/a Longview Ultra I Construction Loan Investment Fund, a collective trust fund organized under the laws of the State of New York (the "Buyer").

In consideration of the consummation of the transactions contemplated by that certain Asset Purchase Agreement dated [_____], 2010 by and between Seller and Buyer (the "APA"), and other good and valuable consideration, Seller hereby sells, transfers, assigns, conveys, and delivers to Buyer all of Seller's right, title, and interest in, to, and under the Purchased Assets, subject to all of the terms and conditions of the APA. Nothing contained in this Agreement shall be deemed to supersede or otherwise affect any of the obligations, agreements, covenants, representations, or warranties of Seller contained in the APA. Capitalized terms not otherwise defined herein have the meanings assigned to them in the APA.

**NEITHER THE SELLER NOR ITS REPRESENTATIVES MAKE ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AND THE PURCHASED ASSETS, THE ASSUMED LIABILITIES AND THE BUSINESSES BEING TRANSFERRED TO BUYER ARE CONVEYED HEREUNDER "AS IS, WHERE IS," AND IN THEIR EXISTING CONDITION.**

IN WITNESS WHEREOF, Seller has caused this Agreement to be executed by its authorized representative as of the date first stated above.

RENAISSANT LAFAYETTE LLC:

_____

By_____
Name:_____
Title:_____

Document No.

## ASSIGNMENT OF DECLARANT RIGHTS UNDER DECLARATION OF CONDOMINIUM OWNERSHIP FOR THE PARK LAFAYETTE CONDOMINIUM

Re: Property described on Exhibit A

Return to:

See Exhibit A
Parcel Number

REINHART\4075545_14RWH:BMH 10/18/10

THIS ASSIGNMENT OF DECLARANT RIGHTS is made this ___th day of December, 2010 by RENAISSANT LAFAYETTE LLC, a Wisconsin limited liability company ("Declarant"), to AMALGAMATED BANK, a bank organized under the laws of the State of New York, as Trustee of Longview Ultra Construction Loan Investment Fund f/k/a Longview Ultra I Construction Loan Investment Fund, a collective trust fund organized under the laws of the State of New York ("Amalgamated").

RECITALS

A.     Declarant executed and caused to be recorded that certain Declaration of Condominium Ownership for the Park Lafayette Condominium dated May 4, 2009 and recorded with the Milwaukee County Register of Deeds on June 5, 2009 as Document No. 09748305 (the "Declaration"), which Declaration encumbers certain real estate legally described on the attached Exhibit A (the "Property").

B.     Declarant retained certain rights under the Declaration.

C.     On the date hereof, Declarant is transferring to Amalgamated the Property.

D.     In connection with Declarant's transfer of the Property, Declarant desires to assign all of its rights under the Declaration to Amalgamated.

NOW, THEREFORE, Declarant hereby assigns any and all of the rights granted to Declarant under the Declaration to Amalgamated, which assignment is made pursuant to Section 11.05 of the Declaration.

Executed the day and year first above written.

DECLARANT

RENAISSANT LAFAYETTE LLC

By:_____
Name: _____
Title: _____

STATE OF _____)
                                              )ss.
COUNTY OF _____)

Personally came before me this _____ day of December, 2010, the above named _____ _____ to me known to be _____ of Renaissant Lafayette LLC, who executed the foregoing instrument, and acknowledged the same on behalf of said partnership.

Name:_____
Notary Public, State of _____
My Commission:_____

This document drafted by:

Robert W. Habich
Reinhart Boerner Van Deuren s.c.
N16 W23250 Stone Ridge Drive, Suite 1
Waukesha, WI 53188

# EXHIBIT A

## EXHIBIT A

> ### LEGAL DESCRIPTION OF THE PROPERTY

### 2000, 3028 AND 3036 NORTH PROSPECT AVENUE
### MILWAUKEE, WISCONSIN

**PARCEL A**

Lots 1, 2 and 3, in Block 20, in Glidden & Lockwood's Addition of Lots 1 and 2 of Fractional Section 22, Town 7 North, Range 22 East, in the City of Milwaukee, County of Milwaukee, State of Wisconsin

ALSO parts of Lots 9 and 10 in Block 20, in Glidden & Lockwood's Addition of Lots 1 and 2 of Fractional Section 22, Town 7 North, Range 22 East, in the City of Milwaukee, County of Milwaukee, State of Wisconsin, which is bounded and described as follows

Beginning at a point in the Southwesterly line of Lot 10 which is 97.50 feet Southeasterly from the Southwesterly corner of said Lot, running thence Northeast in a straight line to a point in the Northeasterly line of said Lot which is 57.50 feet Southeasterly from the Northwesterly corner of Lot 10, running thence Northeasterly and parallel to the East line of North Prospect Avenue 19.00 feet to a point, running thence Northwest in a straight line to the Northwest corner of Lot 9 in said Block, thence Southwesterly along the Westerly line of Lots 9 and 10 aforesaid 120.00 feet to the Southwest corner of Lot 10, running thence Southeasterly along the Southwesterly line of Lot 10 aforesaid 97.50 feet to the point of beginning

Tax Key No 356-0243-100-0
Address 2000 N Prospect Avenue

**PARCEL B**

The Southwesterly 1/2 of Lot 4 in Block 20 in Glidden and Lockwood's Addition in the Northwest 1/4 of Section 22, Town 7 North, Range 22 East, in the City of Milwaukee, County of Milwaukee, State of Wisconsin, excepting that part of Lot 4 conveyed to the Chicago and Northwestern Railway Company by Deed recorded June 5, 1903 in Volume 471 of Deeds on Page 450, as Document No 468977

Tax Key No. 356-0246-0
Address 3036 North Prospect Avenue

**PARCEL C**

The Northeasterly 1/2 of Lot 4 in Block 20 in Glidden and Lockwood's Addition in the Northwest 1/4 of Section 22, Town 7 North, Range 22 East, in the City of Milwaukee, County of Milwaukee, State of Wisconsin, except that part of said Lot 4 conveyed to the Chicago and Northwestern Railway Company by Deed recorded June 5, 1903 in Volume 483 of Deeds on Page 344, as Document No 469580

ALSO,
All that part of Lot 5 in Block 20 in Glidden and Lockwood's Addition in the Northwest 1/4 of Section 22, Town 7 North, Range 22 East, in the City of Milwaukee, County of Milwaukee, State of Wisconsin and all that part of vacated Windsor Place in said City lying North of and adjoining said Lot 5, all bounded and described as follows

Commencing at the Southwest corner of said Lot 5, running thence North along the West line of said Lot and said West line produced North to and across said vacated Windsor Place 110 feet, thence Southeasterly parallel with the Southwesterly line of said vacated street 3 feet, thence Southerly to a point in the Northeasterly line of said Lot 5, 55 feet Southeasterly from the most Northerly corner of said lot, thence Southerly to a point in the Southwesterly line of said Lot, 80 feet Southeasterly from the most Westerly corner thereof, thence Northwesterly along the Southwesterly line of said Lot, 80 feet to the place of beginning

Tax Key No 356-0247-5
Address 3028 North Prospect Avenue

**Schedule 1.1**

**Equipment**

PARK LAFAYETTE INVENTORY LIST:
(NORTH TOWER)

<u>North Tower Lobby:</u>

1) Security Desk
    1 Desk Chair, 1 Computer, 1 Keyboard, 1 Monitor, 1 telephone, 2 decorative silver vases

2) Lobby
    1 Sofa, 1 Side table, 1 coffee table, 2 copper vases, 1 large sales kiosk (computer and monitor in an enclosure base), 2 matching framed art pieces, 1 table lamp, 1 floor lamp

3) Fire Safety Room/ Maintenance Room
    2 desks, 1 chair, 3 monitors, 2 hard drives, 2 key boards, 1 phone


<u>North Fitness Center:</u>

1 universal system, 1 treadmill, 1 recumbent bike, 1 elliptical, 1 floormat, 1 fitness ball


<u>North Tower Community Room:</u>

3 glass pub tables, 12 pub chairs, 2 art panels


PARK LAFAYETTE INVENTORY LIST:
(SOUTH TOWER)

<u>Sales Office 303-S:</u>

1) Back Office (2nd Bedroom)
    1 Desk, 1 Computer, 1 Keyboard, 1 Monitor, 1 lamp, 1 cordless phone, 2 Velour Chairs, 5 Framed Art

2) Conference Room (Living Area)
    1 Minolta Copy machine, 1 Side table, 1 Fellowes paper shredder, 1 Conference table, 6 conf chairs,
    2 table lamps, 1 velour lamp, 1 Khaki rug, 1 Marketing floor plan board, 1 Velour chair

3) Kitchen

1 Keurig coffee maker, 1 Floral arrangement/vase, 1 Wall Clock, 1 box move-in gifts, 1 electronic

printing calculator, 1 mini helium tank

4) Front Office (Master Bedroom)
1 Wraparound desk, 1 desk lamp, 1 desk chair, 2 Velour chairs, 1 telephone, 1 Computer, 1 Key board,

1 monitor, 2 File cabinets, 1 table lamp, 4 closet shelving units, 1 Marketing signage board, 4 decorative

shelves, 10 misc curtains/rods

## Sales Model 307-S:

1) Foyer
1 Foyer table, 1 Framed Art, 2 model signs,

2) Powder Room
2 glass vases, misc towels

3) Kitchen
2 matching aqua vases, 2 metal vases, 1 tray, 2 glass globes, 2 cheese plates, 2 Pearl place settings,

1 large decorative bowls, 1 wine holder, 1 bottle of wine, 1 cookbook, 1 cookbook stand, 1 framed art,

2 barstools

4) Dining Room
1 Dining table, 4 chairs, 2 metal vases, 4 place settings, 1 metal bar cart, 2 cocktail books, 1 metal tray, 1

Stainless steel bartender set, 12 smoky wine glasses, 1 buffet/china cabinet, 8 bottles of wine, 6 chargers,

2 plate stands, 1 sunburst mirror

5) Living Room
1 Velour Sofa, 2 glass side tables, 2 accent lamps, 2 decorative frames, 2 lg copper glass bowls, 1 ivory

box, 2 handpainted vases, 2 leather boxes, 1 bench, 1 chair, Misc art books, 2 green glass vases, 1 silver

centerpiece, 1 8x10 oriental rug

6) Master Bedroom
1 King bed/headboard/decorative pillows bedspread, 1 Dresser, 2 Nightstands, 2 bedside lamps, 3 picture

frames, 2 sm floral pieces, 1 tray, 1 coffee pot, 1 wall mirror, 1 chair, 2 wall candleholders, 1 dresser

lamp, 3 small luggage type boxes, 1 table chest, 2 decorative dresser pieces, 1 wall medallion/

7) Master Bathroom
 1 wicker basket, 2 matching vases, 5 misc glass vases, 1 metal basket, misc towels

8) Guest Bedroom
 1 loveseat, 2 accent tables, 2 matching lamps, 1 chair, 1 throw, 1 decorative book, 2 crystal balls, 4 photo
 Albums, 4 photo boxes, 1 small vase, 2 decorative figurines

Model continued....

9) Guest Bathroom
 4 matching silver hammered vases, 2 photo boxes, 2 pillows in linen closet, 3 misc vases, 1dec box, misc
 Towels, 2 horse prints (art).

## South Tower Lobby:

1) Lobby
 2 framed art, 1 architectual scale model of project and base, 1 computer, 3 monitors, 1 keyboard, 1 wall          signage, 1 sales desk, 2 chairs, 1 register sign, 1 sofa, 1 glass coffee table, 2 leather-like chairs, 1 sales large monitor, 1 velour chair, 1 side buffett table, 3 floral centerpieces, 2 sales center signs

2) Manager Office
 1 wrap around desk, 1 desk chair, 2 velour chairs, 1 computer, 1 key board, 2 decorative trees, 2 file
 Cabinets, 1 card table, 2 folding tables

## South Fitness Center:

1) Fitness area
 1 treadmill, 1 recumbent bike, 1 elliptical machine, 1 universal machine, 3 fitness balls, 1 floormat

2) Kitchen area
 3 velour bar stools, 3 velour chairs, 1 yoga picture on wall

## South tower storage room:

6 artificial trees, 7 framed art misc, 1 desk chair, 1 keyboard/speakers, misc computer items, 1 large monitor, 2 easels, misc marketing signage, box of Park Lafayette t shirts, golf shirts.

**Schedule 1.3**

**Purchase Contracts**

| Counterparty | Date | Unit Number | Parking Space(s) | Purchase Price |
|---|---|---|---|---|
| Michael Schwerm and Suzanne Schwerm | 10/20/2006 | 1-0312 | 115, 116 | $301,900 |
| Bill Harkins and Mary Harkins | 11/15/2006 | 1-0404 | 131, 132 | $354,900 |
| Matthew Maclagan and Jerry Bencherold | 10/27/2006 | 1-0505 | 245 | $258,400 |
| Matthew Johnson | 3/28/2007 | 1-0508 | 316, 317 | $515,400 |
| Matthew Sullivan | 10/6/2006 | 1-0807 | 117, 118 | $404,900 |
| Vassilios Lazaridis | 10/20/2006 | 1-0906 | 261 | $319,400 |
| Karyn Brzezinksi | 11/7/06 | 1-0907 | 125, 126 | $444,400 |
| Jon Gnacinksi and Annette Gnacinski | 9/20/2006 | 1-1008 | 118, 120 | $530,900 |
| Russell Burmeister | 10/4/2006 | 1-1108 | 237, 238 | $543,000 |
| Ebrahin Rassouli and Fereshteh Samaar-Rassouli | 10/16/2006 | 1-1403 | 129, 130 | $476,900 |
| Mary Hood and Donald Hood | 10/20/2006 | 1-1406 | 230-231 | $349,900 |
| Susan Hansen | 6/19/2007 | 1-1407 | 255, 256 | $742,900 |
| Donald Halloran and Susan Halloran | 9/29/2006 | 1-1501 | 532, 533 | $468,400 |
| Ali Nilchian and Roxanne Nilchian | 10/21/2006 | 1-1503 | 228, 229 | $471,900 |

| Counterparty | Date | Unit Number | Parking Space(s) | Purchase Price |
|---|---|---|---|---|
| Thomas Poberezny, Sharon Poberezny | 10/27/2006 | 1-1605 | 120 | $394,900 |
| Thomas Poberezny, Sharon Poberezny | 10/27/2006 | 1-1607 | 239, 240 | $630,195 |
| Thomas Poberezny, Sharon Poberezny | 10/27/2006 | 1-1807 | 432, 433 | $652,263 |
| Mark Hochmuth and Laura Hochmuth | 2/17/2007 | 1-2004 | 259, 260 | $466,900 |
| Russell Burmeister | 10/4/2006 | 1-2007 | 321, 322 | $685,900 |
| John Pocernich | 11/20/2006 | 2-0304 | 249 | $263,900 |
| Karyn Brzezinksi | 11/7/2006 | 2-0605 | 246, 247 | $285,900 |
| Edy Guerra and Beatrice Terry | 3/26/2007 | 2-1007 | 248 | $418,900 |
| James Wellhausen | 4/28/2007 | 2-1106 | 109 | $314,400 |
| Daniel Mathson and Virginia Mathson | 10/16/2006 | 2-1108 | 112, 113 | $630,400 |
| Gary Beyer | 3/23/2007 | 2-1207 | 111 | $384,900 |
| David Wells | 11/7/2006 | 2-1305 | 250, 251 | $434,900 |
| JLS Holdings LLC | 10/16/2006 | 2-2007 | 134, 135 | $705,900 |

**Schedule 1.4**

**Real Property**

All Units in Park LaFayette Condominium, a condominium declared and existing
under and by virtue of the Condominium Ownership Act of the State of Wisconsin
and recorded by a Declaration as such condominium in the Office at the Register
of Deeds for Milwaukee County, Wisconsin, on June 5, 2009, as Document No.
S748305, said condominium being located in the City of Milwaukee, County of
Milwaukee, State of Wisconsin on the real estate described in said Declaration,
and incorporated herein by this reference thereto.
EXCEPT Units 310, 1007, 1707, 1803, 1903, 2002, 2006, Building 1 and Unit 905,
Building 2; also EXCEPT Units G110, G127, G128, G22S, G233, G241, G242, G243,
G244, G314, G315, G352 and G353.

Part of Tax Key No: 356-0243-110-8

SITUATED ON N. PROSPECT AVENUE

## Schedule 1.5

### Prepetition Real Property Leases

| Lessee | Term | Unit Number | Monthly Rent |
|--------|------|-------------|--------------|
| Redacted | 10/1/09 – 9/31/10 | North 305 | $1,325 |
| Redacted | 1/1/09 – 12/31/10 | North 907 | $1,899 |
| Redacted | 9/1/09 – 8/31/10 | North 1206 | $1,750 |
| Redacted | 10/1/09 – 10/31/10 | North 1303 | $2,000 |
| Redacted | 11/1/09 – 10/31/10 | North 2005 | $2,375 |
| Redacted | 7/1/09 – 6/30/10 | South 707 | $2,125 |
| Redacted | 8/1/09 – 6/30/10 | South 1006 | $1,700 |
| Redacted | 8/1/09 – 7/31/10 | South 1303 | $2,000 |
| Redacted | 9/1/09 – 9/30/10 | South 1703 | $2,270 |

**Schedule 1.6**

**Postpetition Real Property Leases**

| Lessee | Term | Unit Number | Monthly Rent |
|---|---|---|---|
| Redacted | 3/27/10 – 4/30/11 | North 301 | $1,300 |
| Redacted | 3./1/10 – 3/31/11 | North 302 | $1,250 |
| Redacted | 5/15/10 – 6/14/11 | North 304 | $1,850 |
| Redacted | 5/1/10 – 5/31/11 | North 305 | $1,325 |
| Redacted | 4/1/10 – 3/31/11 | North 307 | $1,825 |
| Redacted | 6/1/10 – 5/31/11 | North 401 | $1,320 |
| Redacted | 5/1/10 – 5/31/11 | North 402 | $1,350 |
| Redacted | 7/1/10 – 7/30/11 | North 403 | $1,850 |
| Redacted | 3/1/10 – 2/28/11 | North 405 | $1,350 |
| Redacted | 4/1/10 – 6/30/11 | North 406 | $1,575 |
| Redacted | 3/1/10 – 2/28/11 | North 407 | $1,850 |
| Redacted | 3/1/10 – 3/31/11 | North 501 | $1,340 |
| Redacted | 4/1/10 – 4/30/11 | North 502 | $1,290 |
| Redacted | 6/1/10 – 6/30/11 | North 504 | $1,825 |
| Redacted | 4/1/10 – 4/30/11 | North 505 | $1,370 |
| Redacted | 4/1/10 – 4/31/11 | North 506 | $1,525 |
| Redacted | 3/1/10 – 8/31/11 | North 507 | $1,875 |
| Redacted | 3/1/10 – 3/31/11 | North 601 | $1,360 |
| Redacted | 4/1/10 – 4/30/11 | North 602 | $1,310 |

| Lessee | Term | Unit Number | Monthly Rent |
|--------|------|-------------|--------------|
| Redacted | 5/1/10 – 4/30/12 | North 605 | $1,400 |
| Redacted | 6/1/10 – 6/30/11 | North 607 | $2,010 |
| Redacted | 2/1/10 – 2/28/11 | North 701 | $1,380 |
| Redacted | 4/1/10 – 3/31/11 | North 705 | $1,425 |
| Redacted | 3/1/10 – 3/31/11 | North 706 | $1,650 |
| Redacted | 2/1/10 – 7/31/11 | North 707 | $1,900 |
| Redacted | 4/1/10 – 5/31/11 | North 801 | $1,400 |
| Redacted | 4/15/10 – 5/14/11 | North 802 | $1,350 |
| Redacted | 2/1/10 – 2/28/11 | North 805 | $1,385 |
| Redacted | 2/1/10 – 2/28/11 | North 806 | $1,575 |
| Redacted | 3/1/10 – 3/31/11 | North 807 | $1,950 |
| Redacted | 3/31/10 – 3/31/11 | North 901 | $1,420 |
| Redacted | 5/1/10 – 5/31/11 | North 902 | $1,370 |
| Redacted | 8/1/10 – 7/31/11 | North 904 | $1,925 |
| Redacted | 7/1/10 – 7/30/12 | North 906 | $1,700 |
| Redacted | 9/1/10 – 9/30/11 | North 908 | $2,650 |
| Redacted | 4/1/10 – 9/30/10 | North 1001 | $1,440 |
| Redacted | 7/1 – 7/30 | North 1002 | $1,390 |
| Redacted | 1/1/10 – 12/31/11 | North 1005 | $1,450 |
| Redacted | 4/30 – 4/30 | North 1006 | $1,725 |
| Redacted | 6/1 – 6/30 | North 1007 | $2,000 |
| Redacted | 8/1 – 8/31 | North 1008 | $2,650 |

| Lessee | Term | Unit Number | Monthly Rent |
|---|---|---|---|
| Redacted | 6/1/10 – 5/31/12 | North 1101 | $1,460 |
| Redacted | 5/1 – 5/31 | North 1102 | $1,390 |
| Redacted | 5/1 – 5/31 | North 1106 | $1,750 |
| Redacted | 2/1/10 – 1/31/12 | North 1107 | $3,200 |
| Redacted | 5/1 – 5/31 | North 1201 | $1,480 |
| Redacted | 3/1/10 – 2/28/12 | North 1205 | $1,500 |
| Redacted | 3/1 – 2/28 | North 1306 | $1,585 |
| Redacted | 7/1 – 6/30 | North 1402 | $1,470 |
| Redacted | 7/1 – 7/30 | North 1403 | $2,025 |
| Redacted | 5/1 – 4/30 | North 1404 | $2,050 |
| Redacted | 7/1 – 6/30 | North 1406 | $1,650 |
| Redacted | 7/1 – 7/30 | North 1502 | $1,490 |
| Redacted | 6/1 – 5/31 | North 1503 | $2,050 |
| Redacted | 11/1 – 10/31 | North 1504 | $2,300 |
| Redacted | 6/1 – 6/30 | North 1603 | $2,075 |
| Redacted | 4/1 – 9/30 | North 1701 | $2,600 |
| Redacted | 8/1 – 8/31 | North 1801 | $2,625 |
| Redacted | 6/1 – 5/31 | North 1803 | $2,125 |
| Redacted | 6/1 – 7/30 | North 1903 | $2,175 |
| Redacted | 4/1 – 4/30 | North 1906 | $1,925 |
| Redacted | 4/30 – 4/30 | North 2001 | $2,675 |
| Redacted | 11/1 – 10/31 | North 2005 | $2,375 |

| Lessee | Term | Unit Number | Monthly Rent |
|---|---|---|---|
| Redacted | 5/1 – 4/30 | South 301 | $1,300 |
| Redacted | 5/1 – 5/31 | South 305 | $1,325 |
| Redacted | 6/1 – 6/30 | South 306 | $1,475 |
| Redacted | 5/1 – 5/31 | South 309 | $1,436 |
| Redacted | 8/1 – 8/31 | South 401 | $1,320 |
| Redacted | 5/1/09 – 4/30/10 | South 402 | $1,275 |
| Redacted | 6/1/10 – 6/30/11 | South 405 | $1,350 |
| Redacted | 7/1/10 – 7/31-11 | South 406 | $1,475 |
| Redacted | 4/1/10 – 9/30/10 | South 407 | $1,900 |
| Redacted | 9/1/10 – 9/30/11 | South 501 | $1,340 |
| Redacted | 7/1/10 – 7/31/11 | South 502 | $1,290 |
| Redacted | 7/1/10 – 7/31/11 | South 503 | $1,875 |
| Redacted | 6/1/10 – 6/30/11 | South 505 | $1,375 |
| Redacted | 7/1/10 – 7/31/11 | South 506 | $1,600 |
| Redacted | 7/1/10 – 7/31/11 | South 507 | $1,875 |
| Redacted | 7/1/10 – 6/30/11 | South 508 | $2,550 |
| Redacted | 6/1/10 – 6/30/10 | South 601 | $1,340 |
| Redacted | 7/1/10 – 7/31/11 | South 602 | $1,310 |
| Redacted | 6/1/10 – 7/1/11 | South 603 | $1,900 |
| Redacted | 9/1/10 – 9/30/11 | South 604 | $1,850 |
| Redacted | 6/1/10 – 6/30/11 | South 605 | $1,400 |
| Redacted | 8/1/10 – 8/31/11 | South 606 | $1,550 |

| Lessee | Term | Unit Number | Monthly Rent |
|--------|------|-------------|--------------|
| Redacted | 4/1/10 – 9/30/10 | South 607 | $2,000 |
| Redacted | 6/1/10 – 6/30/11 | South 608 | $2,575 |
| Redacted | 6/1/10 – 6/30/11 | South 701 | $1,380 |
| Redacted | 6/1/10 – 6/30/11 | South 702 | $1,330 |
| Redacted | 9/1/10 – 8/31/11 | South 704 | $1,850 |
| Redacted | 7/1/10 – 6/30/11 | South 705 | $1,425 |
| Redacted | 8/1/10 – 8/30/11 | South 706 | $1,600 |
| Redacted | 7/1/10 – 8/1/11 | South 708 | $2,600 |
| Redacted | 7/1/10 – 7/31/11 | South 801 | $1,400 |
| Redacted | 6/1/10 – 6/30/11 | South 802 | $1,350 |
| Redacted | 9/1/10 – 9/30/11 | South 803 | $1,975 |
| Redacted | 9/1/10 – 8/31/11 | South 804 | $1,935 |
| Redacted | 7/1/10 – 7/31/11 | South 805 | $1,450 |
| Redacted | 7/1/10 – 7/31/11 | South 806 | $1,625 |
| Redacted | 7/1/10 – 7/30/11 | South 807 | $1,950 |
| Redacted | 6/1/10 – 6/30/11 | South 808 | $2,625 |
| Redacted | 7/1/10 – 7/31/11 | South 901 | $1,420 |
| Redacted | 6/1/10 – 6/30/11 | South 902 | $1,370 |
| Redacted | 6/1/10 – 6/30/11 | South 905 | $1,475 |
| Redacted | 6/1/10 – 5/31/11 | South 907 | $1,975 |
| Redacted | 6/1/10 – 6/30/11 | South 908 | $2,650 |
| Redacted | 8/1/10 – 8/31/11 | South 1001 | $1,440 |

| Lessee | Term | Unit Number | Monthly Rent |
|--------|------|-------------|--------------|
| Redacted | 7/1/10 – 7/30/11 | South 1002 | $1,390 |
| Redacted | 4/1/10 – 9/30/10 | South 1005 | $1,500 |
| Redacted | 8/1/10 – 7/30/11 | South 1006 | $1,810 |
| Redacted | 6/1/10 – 6/30/11 | South 1102 | $1,000 |
| Redacted | 7/1/10 – 7/31/11 | South 1106 | $1,675 |
| Redacted | 4/1/10 – 9/30/10 | South 1107 | $3,375 |
| Redacted | 7/1/10 – 7/30/11 | South 1108 | $2,700 |
| Redacted | 8/1/10 – 8/30/11 | South 1201 | $1,480 |
| Redacted | 7/1/10 – 8/31/11 | South 1206 | $1,750 |
| Redacted | 4/1/10 – 9/30/10 | South 1207 | $3,400 |
| Redacted | 7/1/10 – 7/31/11 | South 1302 | $1,450 |
| Redacted | 8/1/10 – 7/30/11 | South 1304 | $2,025 |
| Redacted | 8/1/10 – 8/31/11 | South 1305 | $2,150 |
| Redacted | 8/1/10 – 8/31/11 | South 1306 | $1,725 |
| Redacted | 7/1/10 – 7/31/11 | South 1307 | $3,025 |
| Redacted | 8/1/10 – 7/31/11 | South 1402 | $1,470 |
| Redacted | 7/1/10 – 7/31/11 | South 1405 | $2,175 |
| Redacted | 8/1/10 – 7/30/11 | South 1502 | $1,495 |
| Redacted | 9/1/10 – 8/31/11 | South 1505 | $2,310 |
| Redacted | 6/1/10 – 6/30/11 | South 1506 | $1,775 |
| Redacted | 6/1/10 – 6/30/11 | South 1507 | $3,295 |
| Redacted | 8/1/10 – 7/31/11 | South 1602 | $1,520 |

| Lessee | Term | Unit Number | Monthly Rent |
|---|---|---|---|
| Redacted | 6/1/10 – 6/30/11 | South 1604 | $2,100 |
| Redacted | 8/1/10 – 7/31/11 | South 1606 | $1,850 |
| Redacted | 8/1/10 – 7/31/11 | South 1702 | $1,650 |
| Redacted | 9/1/10 – 9/30/11 | South 1703 | $2,160 |
| Redacted | 8/1/10 – 7/31/11 | South 1706 | $1,875 |
| Redacted | 6/1/10 – 6/30/11 | South 1807 | $3,150 |
| Redacted | 8/1/10 – 7/31/11 | South 1905 | $2,275 |
| Redacted | 7/1/10 – 7/31/11 | South 2005 | $2,300 |
| Redacted | 6/1/10 – 6/30/11 | South 2007 | $3,100 |

**Schedule 2.2**

**Asset Allocation**

The Purchase Price shall be allocated in accordance with the fair market value of the Purchased Assets as of the Closing, which the parties agree shall be determined consistent with the methodology and order described as follows:

|     | Asset | Amount Allocated | Order of Allocation of Purchase Price |
|-----|-------|------------------|---------------------------------------|
| (a) | Cash and cash equivalents | The amount of Cash and cash equivalents indicated on the Books and Records as of the Closing | 1st |
| (b) | Accounts Receivable | The amount of Accounts Receivable indicated on the Books and Records as of the Closing | 2nd |
| (c) | Equipment | The replacement cost of the Equipment indicated on the Books and Records as of the Closing | 3rd |
| (d) | Other Intangibles[1] | The fair market value of such intangibles as of the Closing | 4th |
| (e) | Real Estate | The remainder of the Purchase Price not allocated to any of the foregoing assets shall be allocated to Real Estate | 5th |

**Total: $55 million**

---

[1] Other Intangibles are those assets described by paragraphs (c), (d), (g), (h), (i), (j), (k), (p), (q) and (r) of the definition of "Purchased Assets" in the Agreement.

## Schedule 3.4(c)

## Pending Litigation

| Case | Case Number |
|------|-------------|
| Karyn Brzezinksi v. Renaissant Lafayette, LLC, et al. | Milwaukee County Circuit Court Case No. 09-CV-0763 |
| Russell C. Burmeister v. Renaissant Lafayette, LLC, et al. | Milwaukee County Circuit Court Case No. 09-CV-009139 |
| Jon Gnacinski, et al. v. Renaissant Lafayette, LLC | Milwaukee County Circuit Court Case No. 09-CV-002919 |
| Dr. Edy Guerra, et al. v. Renaissant Lafayette, LLC | Milwaukee County Circuit Court Case No. 09-CV-013008 |
| Donald Halloran, et al. v. Renaissant Lafayette, LLC | Milwaukee County Circuit Court Case No. 09-CV-7215 |
| J.L.S. Holdings, LLC v. Renaissant Lafayette, LLC | Milwaukee County Circuit Court Case No. 09-CV-006083 |
| Matthew Johnson v. Renaissant Lafayette, LLC | Milwaukee County Circuit Court Case No. 09-CV-002792 |
| Daniel Mathson, et al. v. Renaissant Lafayette, LLC | Milwaukee County Circuit Court Case No. 09-CV-010759 |
| Ali Nilchian, et al. v. Renaissant Lafayette LLC | Milwaukee County Circuit Court Case No. 09-CV-008194 |
| Thomas Poberezny, et al. v. Renaissant Lafayette LLC | Milwaukee County Circuit Court Case No. 09-CV-7157 |
| John Pocernich v. Renaissant Lafayette LLC | Milwaukee County Circuit Court Case No. 09-CV-005747 |
| Ebrihin Rassouli, et al. v. Renaissant Lafayette LLC | Milwaukee County Circuit Court Case No. 09-CV-016111 |
| Matthew Sullivan v. Renaissant Lafayette LLC | Milwaukee County Circuit Court Case No. 09-CV-006629 |

REINHART\075545_14RWH:BMH 10/18/10

| Case | Case Number |
|------|-------------|
| David Wells v. Renaissant Lafayette LLC | Milwaukee County Circuit Court Case No. 09-CV-005748 |

**Schedule 3.4(d)**

**Governmental Notifications**

1. That certain letter, dated January 11, 2007, from John Hetzer, Plan Examiner for the City of Milwaukee regarding "Architectural plan approval."

**Schedule 5.15**

**Title Policy**

| OFFICE FILE NUMBER | POLICY NUMBER | DATE OF POLICY | AMOUNT OF INSURANCE |
|---|---|---|---|
| 1271378 | | at 7:00 AM | Purchase Price at the 363 sale |

1. Name of Insured:
   PURCHASER AT THE 363 SALE

2. The estate or interest in the land described herein and which is covered by this policy is:
   FEE SIMPLE

3. The estate or interest referred to herein is at Date of Policy vested in the Insured.

4. The land referred to in this policy is described as follows:

   All Units in Park LaFayette Condominium, a condominium declared and existing under
   and by virtue of the Condominium Ownership Act of the State of Wisconsin and
   recorded by a Declaration as such condominium in the Office of the Register of Deeds
   for Milwaukee County, Wisconsin, on June 5, 2009, as Document No. 9748305, said
   condominium being located in the City of Milwaukee, County of Milwaukee, State of
   Wisconsin on the real estate described in said Declaration and incorporated herein
   by this reference thereto.
   EXCEPT Units 310, 1007, 1707, 1803, 1903, 2002, 3006, Building 1 and Unit 905,
   Building 2; also EXCEPT Units G110, G127, G128, G226, G233, G241, G242, G243, G244,
   G314, G315, G352 and G353.

   Part of Tax Key No: 356-0243-110-8

   SITUATED ON N. PROSPECT AVENUE

**PRO FORMA**

DIRECT INQUIRIES TO:
DENISE R. GOGGANS (262) 796-3828 or GOGGANSD@CTT.COM

This policy valid only if Schedule B is attached.          ALTA Owner's Policy (6/17/06)

Policy Number

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

v   1. General taxes for the year 2010, not yet due and payable.

x   2. Covenants, conditions, restrictions, reservations, limitations, uses, agreements, easements, (options) and other provisions (but omitting any such covenant, condition or restriction based on race, color, religion, sex, handicap, familial status or national origin, unless and only to the extent that said covenant (s) is exempt under Chapter 42, Section 3607 of the United States Code, or (b) relates to handicap but does not discriminate against handicapped persons) all as set forth in Park LaFayette Condominium Declaration of Condominium, recorded on June 5, 2009, as Document No. 9768305.

Y   3. Provisions for future assessments as provided for in the Declaration of Condominium noted above.

x   4. Declaration and Covenant Relative to the Park Lafayette Condominium Project executed by and between SIK KIN WU a/k/a SIK KIN NG and WEN CHEN WU a/k/a WEN CHEN NG, his wife, and their respective successors and assigns, and RENAISSANT LAFAYETTE, LLC, a Wisconsin limited liability company, dated April 20, 2005 and recorded April 25, 2005, as Document No. 9223100.

AA  5. Statutory Reserve Account Statement recorded June 22, 2009 as Document No. 9765322.

AC  6. Easement Agreement and Easement recorded September 19, 2005, as Document No. 9303918.

AD  7. Easement and Memorandum of Agreement recorded September 26, 2007, as Document No. 9498764.

AE  8. Vault Agreement recorded October 8, 2007, as Document No. 9505292.

BK  9. Water and sewer service charges, if any, provided, however, there are no delinquent charges for water and sewer.

BQ  10. Rights of tenants disclosed by attached Rent Roll.

BS             * * * * *

CA      This Pro Forma and the premium to be charged are preliminary and subject to final corporate approval such approval must be received prior to closing.

CB             * * * * *

                continued

Countersigned
# PRO FORMA
_____
Authorized Signatory                    ALTA Owner's Policy (6/17/06)

# PRO FORMA

Policy Number:

cc

NOTE: This is a PRO FORMA POLICY furnished to or on behalf of the party to be insured. It does not reflect the present status of title and is NOT A COMMITMENT to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any affirmative coverage shown herein, or as to any matters arising in the gap between the effective date of the commitment and the date of recording of the instruments called for in Schedule B-I of the commitment. Any such commitment to provide affirmative coverage must be an express written undertaking on appropriate forms of the Company.

cc                                         * * * * *

# PRO FORMA

ALTA Owner's Policy (8/17/06)

# ENDORSEMENT

Attached to and forming a part of

Owner's Policy No. 1271378

Issued by

## CHICAGO TITLE INSURANCE COMPANY

The Company insures against loss or damage sustained by the Insured by reason of:

1. The failure of the unit identified in Schedule A and its common elements to be part of a condominium within the meaning of the condominium statutes of the jurisdiction in which the unit and its common elements are located.

2. The failure of the documents required by the condominium statutes to comply with the requirements of the statutes to the extent that such failure affects the Title to the unit and its common elements.

3. Present violations of any restrictive covenants that restrict the use of the unit and its common elements and that are contained in the condominium documents. The restrictive covenants do not contain any provisions that will cause a forfeiture or reversion of the Title. As used in this paragraph 3, the words "restrictive covenants" do not refer to or include any covenant, condition, or restriction (a) relating to obligations of any type to perform maintenance, repair, or remediation on the land, or (b) pertaining to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances, except to the extent that a notice of a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy and is not excepted in Schedule B.

4. Any charges or assessments provided for in the condominium statutes and condominium documents due and unpaid at Date of Policy.

5. The failure of the unit and its common elements to be entitled by law to be assessed for real property taxes as a separate parcel.

6. Any obligation to remove any improvements that exist at Date of Policy because of any present encroachments or because of any future unintentional encroachment of the common elements upon any unit or of any unit upon the common elements or another unit.

7. The failure of the Title by reason of a right of first refusal to purchase the unit and its common elements which was exercised or could have been exercised at Date of Policy.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated:

CHICAGO TITLE INSURANCE COMPANY

## PRO FORMA

By:

Authorized Signatory

ALA108 8/08 KMB

ALTA Endorsement Form 4.1-06
(Condominium) (6/17/06)

**Exhibit B**

**Cure Amounts**

| Date | Counterparty | Term | Description of Services | Cure Amount |
|------|--------------|------|-------------------------|-------------|
| 9/11/2007 | Capitol Infrastructure, LLC | 9/11/07 – 9/11/17 | Provide and maintain infrastructure to enable video and data services; arrange with service providers to provide such services. | $2,298 |